UNITED STATES of America,
Plaintiff-Appellee,

v.

Juan Manuel BAUTISTA,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Javier CABRERA–MARTINEZ,
Defendant-Appellant.

Nos. 81–1286, 81–1326.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1982.

Decided Aug. 24, 1982.

Eugene C. Moscovitch, Santa Monica, Cal., for Bautista.

Victor B. Kenton, Los Angeles, Cal., for Cabrera-Martinez.

Fredrick M. Flam, Asst. U. S. Atty., Los Angeles, Cal., for the U. S.

Before CHOY, KENNEDY and FARRIS, Circuit Judges.

FARRIS, Circuit Judge:

Defendants Juan Manuel Bautista and Javier Cabrera-Martinez appeal their convictions for unarmed bank robbery. They argue that the district court should have suppressed certain statements, confessions, and other seized evidence. We affirm.

## FACTS

On the afternoon of March 5, 1981, three men robbed the Woodland Hills, California, branch of Lloyds Bank. More than one thousand dollars was taken, including several bait bills with prerecorded serial numbers. Immediately following the robbery, a police report broadcast to units patrolling in the vicinity of the robbery described the bank robbers as being armed and of Iranian or Mexican descent. A follow-up broadcast further reported that the suspected getaway car had been sighted parked on Queen Florence Lane, a side street in an affluent residential neighborhood approximately one-half mile from the bank.

Los Angeles Police Officers John Gaspar and Richard Powers heard the broadcasts on their patrol car radio. Based on their familiarity with the general area, they concluded that the suspects might flee from the suspected getaway car by proceeding down a small hill to Wells Drive, an east-west through street leading out of the residential area. The officers decided to drive along this possible escape route toward the getaway car. Approximately 15 minutes after the first robbery report, the officers saw Bautista and Martinez walking along Wells Drive. At this point, Bautista and Martinez were one-half mile from the bank and approximately three and one-half blocks down the hill from the suspected getaway car. Bautista and Martinez matched the description of the robbers as being of Mexican or Iranian descent. The policemen also noted that Bautista and Martinez were shabbily dressed in short-sleeve shirts and appeared relatively dry, although it had been raining throughout the day and was raining at the time. The officers decided to stop them for questioning.

As the officers exited their patrol car, Bautista approached and volunteered that he had just gone to a nearby house and had asked the woman who answered the door to call a cab. Officer Powers frisked Bautista and Martinez for weapons and found none. Both were then handcuffed, and Officer Powers proceeded to the house to check

Bautista's story. During the suppression hearing, Officer Powers explained the use of the handcuffs:

At that time a robbery of the bank had been committed and I believed that they were possibly the suspects and also because I observed tracks on their arms related to use of narcotics and also it was for officer safety as a precaution. I knew I was going to go to the front door of a residence to verify their story and I'd be leaving my fellow officer partner, John Gaspar, alone with the suspects. And because the suspects appeared extremely nervous and suspect Bautista kept pacing back and forth and looking, turning his head back and forth as if he was thinking about running.

The woman at the house verified that Bautista had asked her to call a cab, telling her that their car had broken down. However, when Powers returned and asked where the car was, Bautista replied that they did not have a car. The policemen then separated Bautista and Martinez by about thirty feet for further questioning.

During the separate questioning, the officers asked the defendants a series of questions concerning their identity, their companion's identity, the identity of the person who dropped them off in the neighborhood, the kind of car that person had been driving, their reason for being in the neighborhood, the person they were meeting, their knowledge of the street names in the neighborhood, and whom they knew in the neighborhood. The defendants gave inconsistent as well as suspicious answers. They did not know each other's names, the names of the streets, who dropped them off, or who they were meeting. Martinez said the car that dropped them off was green, and Bautista said it was blue. Martinez gave a false name and then was unable to spell it. At one point Bautista switched his story

and said he had been dropped off to make a dope purchase and that he had $250 in cash for the transaction. When asked if he had any money for cab fare, Martinez also said he had about $250. Defendants claim this separate questioning lasted approximately 10–12 minutes. The policemen testified that the entire stop took only 10–12 minutes.

After comparing the inconsistent and contradictory responses, the officers told the defendants they were under arrest. They were taken to police headquarters, searched, and then given *Miranda* warnings. During the search, the police found several of the bait bills taken from the bank. Both defendants subsequently confessed to committing the bank robbery.

## ANALYSIS

### I. FOURTH AMENDMENT CLAIMS

Defendants argue that the initial stop was not supported by a founded suspicion of criminal activity, that the use of handcuffs constituted an arrest without probable cause, that the continued detention and interrogation exceeded what is permissible during an investigatory stop, and that at the time of the formal arrest the police still did not have probable cause. We reject the arguments.

### A. INITIAL STOP

Defendants contend the stop was based on nothing more than the defendants' racial appearance, and that therefore the police did not have the founded suspicion of criminal conduct necessary under the Fourth Amendment to justify the stop. *See Terry v. Ohio*, 392 U.S. 1, 19–22, 30, 88 S.Ct. 1868, 1878–80, 1884, 20 L.Ed.2d 889 (1968).[1]

---

1. After the enactment of Fed.R.Evid. 402, it remains unclear whether the fruits of a stop which did not violate federal constitutional standards are nevertheless inadmissible if state statutory or constitutional standards were violated. *See United States v. Collom*, 614 F.2d 624, 627–28 (9th Cir. 1979), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). We need not resolve this question with respect

to the initial stop because the California and federal standards governing the legality of investigatory stops are the same. *See, e.g., United States v. Chamberlin*, 644 F.2d 1262, 1265 n.1 (9th Cir. 1980), *cert. denied*, 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); *Collom*, 614 F.2d at 628. Defendants have not shown a more favorable California state standard with respect to any of the issues raised on appeal.

Race or color alone is not a sufficient basis for making an investigatory stop. *United States v. Brignoni-Ponce*, 422 U.S. 873, 886–87, 95 S.Ct. 2574, 2582–83, 45 L.Ed.2d 607 (1975); *United States v. Mallides*, 473 F.2d 859, 862 (9th Cir. 1973) (citing *Davis v. Mississippi*, 394 U.S. 721, 726–27, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969)). However, race can be a relevant factor. *Brignoni-Ponce*, 422 U.S. at 886–87, 95 S.Ct. at 2582–83. For example, a founded suspicion to make a border patrol stop can be based in part upon "the characteristic appearance of aliens." *United States v. Harrington*, 636 F.2d 1182, 1185 (9th Cir. 1980). Here, the police did not stop the defendants solely because their racial appearance matched the racial description of the robbery suspects. The police also noted the defendants' presence on a likely escape route one-half mile from the bank and a few blocks from the suspected getaway car, only 15 minutes after the robbery. The defendants were the only people in sight who matched the description of the robbers. The policemen observed that the defendants' dress was inappropriate for the weather, and that their relatively dry appearance, despite the rain, was consistent with having just left a car. These facts and circumstances justified the police officers' decision to make an investigatory stop. Treating racial appearance as one factor contributing to the founded suspicion of criminal conduct was not inappropriate.

## B. USE OF HANDCUFFS

On the one hand, handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop. On the other hand, police conducting on-the-scene investigations involving potentially dangerous suspects may take precautionary measures if they are reasonably necessary. The purpose of the *Terry* frisk is "to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).[2]

Defendants argue that they were automatically under arrest once they were handcuffed because from that moment on they were "not free to leave." Defendants rely on *United States v. Beck*, 598 F.2d 497 (9th Cir. 1979), and *United States v. Strickler*, 490 F.2d 378 (9th Cir. 1974). We considered and rejected the same argument based on the same cases in *United States v. Patterson*, 648 F.2d 625, 632–34 (9th Cir. 1981). A brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a *Terry* stop and does not necessarily convert the stop into an arrest. *Id.* at 632–33. We specifically approved the use of handcuffs in *United States v. Thompson*, 597 F.2d 187 (9th Cir. 1979). The handcuffs were reasonably necessary in *Thompson* because the suspect had "repeatedly attempted to reach for his inside coat pocket, despite the officers' repeated warnings not to." *Id.* at 190. *See also United States v. Purry*, 545 F.2d 217, 219–20 (D.C.Cir.1976) (handcuffing of suspect permissible because the suspect "turned and pulled away" when the police officer placed an arm on him).

The initial handcuffing in this case was not excessive. It was not unreasonable for Officer Gaspar to take adequate protective measures before remaining with two men suspected of armed bank robbery, particularly when "the suspects appeared extremely nervous and suspect Bautista kept pacing back and forth and looking, turning his head back and forth as if he was thinking about running." Continued use of the handcuffs after Officer Powers had returned from the house presents a much closer question. But the fact is that de-

---

2. *See Terry*, 392 U.S. at 23, 88 S.Ct. at 1881:

We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.

fendants were suspected of robbery in which three men with guns participated and the third robber might still have been in the vicinity. The handcuffs eliminated the possibility of an assault or escape attempt during the questioning, particularly if an arrest became imminent. Considering the nature of the criminal activity involved, *United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977), and viewing the evidence adduced at the suppression hearing in the light most favorable to the government, *United States v. Vital-Padilla*, 500 F.2d 641, 642–43 (9th Cir. 1974), we conclude that the district court was not clearly erroneous in not finding that use of the handcuffs during the separate questioning was unreasonable under the circumstances.

## C. CONTINUED DETENTION AND INTERROGATION

Defendants contend the separate questioning exceeded what is permissible during a *Terry* stop in terms of both duration and scope of inquiry. They then argue that because the police did not have probable cause, the separate questioning was illegal. Defendants rely principally upon *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The Court in *Dunaway* stated that "investigative stops usually consumed less than a minute and involved 'a brief question or two.'" 442 U.S. at 210–11, 99 S.Ct. at 2255 (quoting *Brignoni-Ponce*, 422 U.S. at 880, 95 S.Ct. at 2579). *See also United States v. Chamberlin*, 644 F.2d 1262, 1266 (9th Cir. 1980) (reasonable suspicion was sufficient to justify "a brief stop and a few brief questions"), *cert. de-*

*nied*, 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).

 However, inquiries during investigative stops need not always be limited to one or two questions, provided the questions asked are "reasonably related in scope to the justification for their initiation." *Brignoni-Ponce*, 442 U.S. at 881, 95 S.Ct. at 2580 (quoting *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884). Thus, police making a routine investigative stop may ask the suspects "to explain suspicious circumstances." *Brignoni-Ponce*, 442 U.S. at 882, 95 S.Ct. at 2580; *Dunaway*, 442 U.S. at 212, 99 S.Ct. at 2256. Nor must investigative stops always be terminated within a couple of minutes. "If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams*."[3] *Michigan v. Summers*, 452 U.S. 692, 700 n.12, 101 S.Ct. 2587, 2593 n.12, 69 L.Ed.2d 340 (1981).

We have upheld investigative stops taking longer than a minute or two and involving more than one or two questions in numerous prior cases. *See, e.g., United States v. Anderson*, 663 F.2d 934 (9th Cir. 1981) (police officers reasonably suspecting a chartered aircraft of transporting narcotics may stop and question the passengers regarding their relationship with the pilots and their knowledge of the presence of narcotics); *United States v. Richards*, 500 F.2d 1025 (9th Cir. 1974) (*Terry* stop lasting more than an hour did not violate the Fourth Amendment; the scope of inquiry did not go beyond the justification for the

**3.** The Court quoted the following passage from 3 W. LaFave, Search and Seizure § 9.2, pp. 36–37 (1978):

It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained. Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered or to confirm the identification or determine whether a person of that identity is otherwise wanted. Or, the

suspect may be detained while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises, locating and examining objects abandoned by the suspect, or talking with other people. If it is known that an offense has occurred in the area, the suspect may be viewed by witnesses to the crime. There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use makes the period of detention unduly long or involves moving the suspect to another locale.

stop and the extended detention was justified by the police officers' attempts to check the suspects' unsatisfactory and evasive answers to routine questions), *cert. denied*, 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975); *see also United States v. Kennedy*, 573 F.2d 657, 659 (9th Cir. 1978); *United States v. Collom*, 614 F.2d 624 (9th Cir. 1979), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980).

■ Here, the questions asked by the police officers were reasonably related in scope to the justification for the stop. Follow-up questions were made necessary by defendants' unconvincing and suspicious answers to the initial, routine questions. *See United States v. Richards*, 500 F.2d at 1029. Even if we accept defendants' claim that the separate questioning lasted 10–12 minutes, there is nothing in the record to suggest that the stop was for a longer period than was reasonably necessary. Thus, we cannot find that either the scope of the inquiry or the duration of the investigative stop was excessive.

## D. FORMAL ARREST

■ Defendants' final Fourth Amendment claim, that the police officers still lacked probable cause at the time of the formal arrest, is contradicted by the facts of the case. Defendants were in the vicinity of the robbery and the suspected getaway car, matched the description of the robbers, were carrying large sums of money, and gave inconsistent and unpersuasive answers to routine questions. Defendants appeared to be concealing the whereabouts of a car. Martinez was unable to spell his own name. Bautista changed his story in midstream. All of these facts and circumstances added up to probable cause.

## II. *MIRANDA* WARNINGS

■ Interrogation initiated by law enforcement officers after a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be preceded by *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). *Accord, United States v. Wilson*, 666 F.2d 1241, 1246 (9th Cir. 1982). Defendants con-

tend they were in custody during the separate questioning, and that therefore the officers' failure to give them their *Miranda* warnings requires suppression of all statements made during the stop or later at the police station. We disagree.

*Miranda* warnings are necessary even during a *Terry* stop if the suspect has been taken into custody or if the questioning otherwise takes place in a police dominated or compelling atmosphere. *Wilson*, 666 F.2d at 1247; *United States v. Hickman*, 523 F.2d 323, 327 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976); *United States v. Harris*, 611 F.2d 170, 172 (6th Cir. 1979). However, *Terry* stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings. *See generally Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977):

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question.... *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was applicable, and to which it is limited.

*See also Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694:

> Our decision is not intended to hamper the traditional function of police officers in investigating crime.... General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement.

In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

*Id.* at 477–78, 86 S.Ct. at 1629 (citation and footnote omitted).

The limits we have placed on the interrogation process should not constitute an undue interference with a proper system of law enforcement. As we have noted, our decision does not in any way preclude police from carrying out their traditional investigatory functions.

*Id.* at 481, 86 S.Ct. at 1631.

To determine whether a suspect had been placed in custody, we look to "the language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt,[4] the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual." *United States v. Booth,* 669 F.2d 1231, 1235 (9th Cir. 1981). "Based upon a review of all the pertinent facts, the court must determine whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *Id.* When applying these factors to determine whether a suspect had been placed in custody, the district courts use an objective reasonable man test, *United States v. Luther,* 521 F.2d 408, 410 (9th Cir. 1975); *United States v. Scharf,* 608 F.2d 323, 325 (9th Cir. 1979), and we review the district court's determination under the clearly erroneous standard of review, *United States v. Booth,* 669 F.2d at 1236.

Applying the factors outlined in *Booth* to this case, we conclude that the district court's determination that defendants had not been placed in custody during the separate questioning is not clearly erroneous. The defendants were not confronted with any evidence of their guilt. Neither the language used by the officers to summon the defendants, the physical surroundings of the interrogation, nor the duration of the detention could be considered to be coercive as that term was used in *Miranda.* The only way in which this case seems to differ from a routine *Terry* stop is that defendants were handcuffed. However, as we said in *Booth,* "Handcuffing a suspect does not necessarily dictate a finding of custody. . . . Strong but reasonable measures to insure the safety of the officer or the public can be taken without necessarily compelling a finding that the suspect was in custody." 669 F.2d at 1236 (citation omitted). The facts of this case fall short of the sorts of police dominated and compelling atmospheres presented in the four cases under review in *Miranda v. Arizona. See* 384 U.S. at 491–99, 86 S.Ct. at 1636–40.

## CONCLUSION

The police officers committed no Fourth Amendment violations. The initial stop was supported by a founded suspicion of criminal activity. The handcuffing was reasonable under the circumstances and did not constitute an arrest without probable cause. The separate questioning was not excessive either in scope or duration. At the time of the formal arrest, the police had probable cause. Defendants' *Miranda* claim also fails. Defendants were not in custody during the separate questioning. The police conducted a valid investigatory stop followed by a valid arrest.

AFFIRMED.

---

4. The continued relevance of this factor is at least open to question. *See Oregon v. Mathiason,* 429 U.S. at 495–96, 97 S.Ct. at 714 (officer's false statement during police station interview to the effect that suspect's fingerprints had been found at the scene of the burglary "has nothing to do with whether respondent was in custody for the purpose of the *Miranda* rule").