**UNITED STATES, Appellee,**

v.

**Fred S. BERRYMAN, Defendant, Appellant.**

No. 82–1194.

United States Court of Appeals, First Circuit.

Argued Sept. 10, 1982.

Decided May 6, 1983.

Karnig Boyajian, Boston, Mass., for defendant, appellant.

John C. Doherty, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before SWYGERT,* Senior Circuit Judge, BOWNES and BREYER, Circuit Judges.

SWYGERT, Senior Circuit Judge.

On September 8, 1981, the defendant in this case, Fred S. Berryman, was accosted by two Drug Enforcement Administration ("DEA") agents after his arrival at Logan International Airport in Boston from Fort Lauderdale, Florida. In the course of this encounter two pounds of cocaine were discovered inside a package within the defendant's suitcase. He was subsequently indicted on a charge of knowingly possessing with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) (1976). Before trial the defendant moved to suppress evidence and statements produced as a result of the encounter, arguing that they had been obtained in violation of the fourth amendment to the United States Constitution. After an evidentiary hearing the district court denied the motion, and the defendant was convicted following a jury trial. This appeal, which challenges the denial of the motion to suppress, raises two issues: whether the encounter between the defendant and the DEA agents is governed by the fourth amendment's proscription of "unreasonable seizures" at all, and if so whether it was justified by reasonable suspicion. The district court did not reach the second issue because it found that no seizure had occurred. We reverse.

I

At the suppression hearing the two DEA agents and the defendant testified. The district court made some specific findings and generally credited the agents' testimony. Tr. 135, 137. The facts so found are as follows.

The defendant arrived at Logan Airport on Delta Airlines flight 326, which was scheduled to arrive at 8:14 P.M., but in fact arrived at about 8:30. Tr. 3–6, 23–24. The flight originated in Fort Lauderdale, which is known to be a "source city" for the illegal distribution of narcotics. Tr. 4–5. The agents observed Berryman, who was among neither the first nor the last to leave the plane, walk quickly toward the terminal and glance over his shoulder once. Tr. 6, 25, 135. The agents next observed the defendant in the baggage claim area, where he stood five to ten feet from the baggage carousel, occasionally looked around, and picked up one bag. Tr. 7. His manner suggested he might have been looking for someone who was to pick him up. Tr. 30. He later told the agents that his wife was to meet him. Tr. 45. When he walked to the sidewalk outside the terminal, looking around once more, the agents approached him for questioning. Tr. 7. Their approach

* Of the Seventh Circuit, sitting by designation.

was motivated only by what they had observed, not by a tip. Tr. 11–12.

Standing on either side of Berryman but not touching him, the agents identified themselves as DEA agents and asked whether he would answer some questions. Tr. 8–9, 21. When he agreed, they asked where he had arrived from, and he answered truthfully. Tr. 9. They next asked to see his airline ticket and some identification, and Berryman complied. The ticket was one-way and had been paid for in cash; the name on the ticket corresponded to that on the driver's license Berryman produced. Tr. 9. When asked why and how long he had been in Fort Lauderdale, Berryman said he had been there for three days on business concerning the purchase of land in Alaska. Tr. 9–10. The defendant asked what was the matter; the agents replied that the level of drug traffic between Fort Lauderdale and Boston was high. Tr. 10.

The agents then asked whether they could search Berryman's suitcase, and he consented. Agent Lemon testified that he informed the defendant that he could refuse to give them permission to search the suitcase. Tr. 11. The defendant's testimony was that at this point he inquired whether he had any choice in the matter and was informed, "not really." Tr. 103. The suitcase, which Berryman unlocked on the sidewalk, contained a giftwrapped package with a card, which Berryman said he was delivering for someone he had met in Florida and whose contents were unknown to him. Tr. 12–13. After feeling the package and opening the card with the defendant's permission, Lemon obtained permission to x-ray the package. Tr. 12–14. The defendant accompanied the agents to the security area. Tr. 15. Lemon testified that at this point Berryman was not free to leave. Tr. 48, 49. When the x-ray revealed no solid objects Lemon told Berryman that he suspected the package contained cocaine, and obtained permission to open it. Tr. 16. Berryman accompanied the agents to a Delta Airlines baggage claim office; he remained outside the office with Agent Fencer while Lemon entered the office and opened the package. Tr. 16–17. Fencer testified that he would have prevented Berryman from leaving at this point unless Lemon consented, because Lemon was in charge. Tr. 86–88. The package contained two bags of cocaine. Tr. 17–18. Lemon gave Berryman *Miranda* warnings but advised him that he was not then under arrest. Tr. 19. Berryman was taken to the DEA airport office, where the agents called the office of the United States Attorney, patted Berryman down, and checked his identification again. Tr. 20–21. Berryman left after being told that he might be arrested at a later time. Tr. 20–21.

## II

### A

In *Terry v. Ohio,* 392 U.S. 1, 19, 20, 25–27, 88 S.Ct. 1868, 1878, 1879, 1882–83, 20 L.Ed.2d 889 (1968), the Supreme Court rejected both the notion that the fourth amendment does not regulate police-citizen encounters falling short of arrests, and the notion that it prohibits encounters based on less than probable cause for arrest. Instead, the Court held that, although some police-citizen encounters do not implicate fourth amendment concerns at all, *id.* at 19 n. 16, 88 S.Ct. at 1879 n. 16, more intrusive encounters short of arrests must be justified by reasonable suspicion proportional to the degree of the intrusion, *id.* at 19, 20–22, 88 S.Ct. at 1878, 1879–80. That suspicion cannot be inchoate, but must be based on "specific and articulable facts . . . together with rational inferences from those facts" in order to establish a basis for review of the police actions. *Id.* at 21, 88 S.Ct. at 1880; *see also Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (per curiam); *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); *Adams v. Williams,* 407 U.S. 143, 146–49, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972).

■ We note initially that no articulable suspicion existed in this case at the time the DEA agents first accosted Berryman, making their investigation proper only if the encounter was not the type regulated by the fourth amendment. The facts that prompted the investigation—that Berryman had arrived from Fort Lauderdale, that he walked quickly and looked over his shoulder once, and that he stood five or ten feet from the baggage carousel, looked around several times, and picked up one bag—are weaker than those the Court found insufficient in *Reid v. Georgia,* 448 U.S. at 441, 100 S.Ct. at 2754. In *Reid* the defendant had arrived from Fort Lauderdale, had arrived early in the morning, had picked up no luggage, and had glanced repeatedly over his shoulder and otherwise appeared to try to conceal the fact that he was traveling with a companion. The Court assigned the first three circumstances no weight because they "describe[d] a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that [so] little . . . could justify a seizure." *Id.* It found that if the last circumstance was suspicious at all, the suspicion was too " 'inchoate and unparticularized' " to justify the investigation. *Id.,* quoting *Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. at 1883. The circumstances in the present case are, if possible, even less suspicious. As in *Reid,* most are completely innocent: arrival from Fort Lauderdale, standing slightly away from the baggage carousel, and picking up one suitcase. Walking quickly and looking around (which the agents dubbed "scanning the area," although they admitted that the behavior they observed was like that of someone waiting for a ride) were equally innocuous, especially in light of the lateness of the flight. The sole remaining circumstance is that Berryman looked over his shoulder once on the way to the terminal. If this action is worthy of note at all, it is far slenderer a reed on which to base an investigation than the avoidance maneuvers the Court found insufficient in *Reid.* Nor do we find the combination of circumstances present here any more suspicious than the individual items.

■ The harder question is whether the encounter between the agents and Berryman raises any fourth amendment concerns. The district court, relying on this circuit's decision in *United States v. West,* 651 F.2d 71, 72–73 (1st Cir.), *petition for cert. filed,* 50 U.S.L.W. 3132 (U.S. Sept. 8, 1981) (No. 81–307), which endorsed the test for fourth amendment seizures proposed in one of the several opinions of the fragmented Court in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (a seizure occurs in circumstances in which a reasonable person would not feel free to leave), held that there was no seizure. It reasoned that

> [the agents were] in plain clothes. Their weapons were concealed, although there may have been some inadvertent display. They were not displayed openly. There was no physical restraint. I accept the agents' testimony that Mr. Berryman was told that he was free to leave. The area was public.
>
> I conclude that, on these facts, a reasonable person would not have believed that he was not free to leave or decline to answer any question.

Tr. 137–38.

The facts on which the court based its conclusion that no seizure had occurred are reviewable for clear error. *See* Fed.R. Civ.P. 52(a). One of the findings on which the court placed heavy reliance, that the agents told Berryman he was free to leave, *see id.;* tr. 139 ("I conclude that and find he was told he was free to leave."), is clearly erroneous. No testimony supports this finding, and in fact it was contradicted by the agents during the suppression hearing. *See* tr. 40 (Berryman was not told he was free to go at the beginning of the encounter); tr. 45 (Berryman was not told he was free to go when permission to search was requested).

The emphasis the trial judge placed on this mistaken factor suggests that he viewed the remaining facts as insufficient

by themselves to establish that an atmosphere existed in which a reasonable person would feel free to leave. This impression is bolstered by the fact that the absence of such a warning is sometimes noted as significant in characterizing police-citizen encounters. *See Florida v. Royer,* —— U.S. ——, ——, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) (failure to tell defendant he was free to go contributed to characterization of encounter as an arrest); *Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979) (same); *United States v. Patino,* 649 F.2d 724, 727 (9th Cir.1981) (failure to inform defendant she was free to leave or to refuse to answer contributed to characterization of encounter as seizure); *United States v. Hill,* 626 F.2d 429, 435–36 (5th Cir.1980) (arrest). *See also* A Model Code of Pre-Arraignment Procedure §§ 110.1(2), 110.2(5) & Commentary 260–61, 285–88 (1975) (requiring warnings). The impression is also borne out by the testimony at the hearing. Agent Lemon testified that when he approached Berryman,

> I came to Mr. Berryman's left, and Agent Fencer came to his right. In other words, we were standing beside him. We went in front of him and we went in back of him.

Tr. 8. The number and position of officers have been recognized as important considerations for determining whether an atmosphere of restraint can be said to have existed. *See United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (opinion of Stewart, J.); *United States v. Berry,* 670 F.2d 583, 597 (11th Cir.1982) (en banc) ("blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance"); *United States v. Morin,* 665 F.2d 765, 769 (5th Cir.1982); *United States v. West,* 651 F.2d at 73; *United States v. Patino,* 649 F.2d at 727.

The fact that Berryman exhibited no apprehension when he was approached by the DEA agents does not weaken our conclusion. This is true for three reasons: first, because the test is an objective one, concerned with whether a reasonable person would feel he could leave, it does not matter whether a particular defendant feels intimidated or at ease. *See United States v. Viegas,* 639 F.2d 42, 44 (1st Cir.), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981). Second, to hold otherwise would place defendants in the cruel dilemma of either appearing to feel free to go so that the stop does not implicate the fourth amendment, or appearing apprehensive so that the stop is justified by reasonable suspicion, thus validating the stop in either case. Finally, the correlation between lack of restraint and lack of anxiety seems to us to be weak. Cooperativeness could indicate submission or indifference as easily as it indicates lack of restraint. *Cf. Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968) (acquiescence not probative of consent). The fact that Berryman acquiesced in the questioning is unimportant for the same reasons.

■ Moreover, even if the initial encounter in this case were not the kind of stop regulated by the fourth amendment, it is clear that Berryman was "seized" at some point during the encounter. Agent Lemon testified that after discovery of the package Berryman was not free to leave, a judgment to which Agent Fencer deferred, and, although his subjective intent to restrain the defendant is not determinative, *see United States v. Mendenhall,* 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6 (opinion of Stewart, J.), the inference that he conveyed that intent in his tone of voice and manner when he asked Berryman to accompany him to the x-ray machine is powerful. *See United States v. Berry,* 670 F.2d at 598; *cf. Florida v. Royer,* —— U.S. at —— & n. 8, 103 S.Ct. at 1327 & n. 8 (plurality opinion). By that point, therefore, Berryman had been "seized" for fourth amendment purposes, and he may have been restrained even earlier. If at the moment he first felt restrained there was no reasonable suspicion or valid consent, the seizure violated the fourth amendment.

We think that the prolongation of the questioning in this case created an atmosphere of restraint prior to the time the suitcase was opened, even if Berryman's freedom to leave was not curtailed by the agents' initial approach. A reasonable person would not feel free to walk away when, after answering truthfully where he had been and for how long, and proffering his airline ticket whose information is confirmed by other identification, he is questioned further and confronted with the suspicion of drug trafficking. *See Florida v. Royer,* —— U.S. at ——, 103 S.Ct. at 1325 ("an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop") (plurality opinion); *id.* at ——, 103 S.Ct. at 1326 ("Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that 'a reasonable person would have believed he was not free to leave.' ") (quoting *United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (opinion of Stewart, J.)); *Terry v. Ohio,* 392 U.S. at 18, 88 S.Ct. at 1878 ("a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope"); *id.* at 28–29, 88 S.Ct. at 1883–84 ("The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation."); *United States v. Gooding,* 695 F.2d 78, 82 (4th Cir.1982) (prolongation of questioning when preliminary questions fail to raise any suspicion contributes to finding that defendant was detained); *United States v. Bautista,* 684 F.2d 1286, 1290 (9th Cir.1982) (prolonged questioning must be justified); *United States v. Berry,* 670 F.2d at 597 ("Statements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention.") (footnote omitted); *see also United States v. Jodoin,* 672 F.2d 232, 235 (1st Cir.1982) (when answers to initial questions produce additional suspicion they justify further questioning). Berryman's answers to the initial questions in the present case did not create suspicion when none existed before. He answered the questions truthfully. The name on his ticket matched the name he gave the agents and the one on his driver's license. He did not appear nervous. The only possible source of suspicion [1] was that his ticket was one-way and had been paid for in cash, a typical element of "drug courier profiles." But one drug courier characteristic standing alone does not create a reasonable basis for a fourth amendment seizure. *See Reid v. Georgia,* 448 U.S. at 441, 100 S.Ct. at 2754; *United States v. Gooding,* 695 F.2d at 83; *United States v. Berry,* 670 F.2d at 600–01; *United States v. Rico,* 594 F.2d 320, 326 (2d Cir.1979); *United States v. Smith,* 574 F.2d 882, 884 (6th Cir.1978). This is true for a simple reason: the profile is simply a collage of otherwise innocent characteristics designed to guide the focus of the agents' observations, and only when the characteristics are combined in a suspicious manner, or lead the agents to observe independently suspicious conduct, is official intrusion warranted. *See United States v. Berry,* 670 F.2d at 600–01; *see also Florida v. Royer,* —— U.S. at ——, 103 S.Ct. at 1326 (plurality opinion) (reasonable suspicion existed only because of the combination of use of an assumed name, paying cash for one-way ticket, checking bags with incomplete identification tags, and nervous conduct). We conclude that when the agents continued to question Berryman they lacked a reasonable basis to detain him and violated his fourth amend-

---

1. We disagree with the dissent's assumption that Berryman's statement that he was in Florida to conduct negotiations concerning Alaskan land is suspicious; the state of Florida is not devoid of land speculators, with whom Berryman might plausibly have been dealing.

ment right to be free from such interference. If Berryman subsequently consented to the search of his suitcase and its contents, that consent did not expunge the earlier illegality.[2]

## B

In our discussion thus far we have assumed that a "seizure" is an independently ascertainable fact. The Supreme Court's treatment of this issue, however, indicates that the existence of reasonable suspicion and the existence of a fourth amendment stop are not unrelated questions. *Terry v. Ohio,* 392 U.S. at 17, 88 S.Ct. at 1877 (footnote omitted), rejected precise categorization of types of encounters:

> The danger in the logic which proceeds upon distinctions between a "stop" and an "arrest," or "seizure" of the person is two-fold. It seeks to isolate from constitutional scrutiny the initial stages of the contact between the policeman and the citizen. And by suggesting a rigid all-or-nothing model of justification and regulation under the Amendment, it obscures the utility of limitations upon the scope, as well as the initiation, of police action as a means of constitutional regulation.

Instead, *Terry* held that "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible," *id.* at 19, 88 S.Ct. at 1878 (quoting *Warden v. Hayden,* 387 U.S. 294, 310, 87 S.Ct. 1642, 1651, 18 L.Ed.2d 782 (1967) (Fortas, J., concurring)), and emphasized that "the central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. 'Search' and 'seizure' are not talismans." *Id.* One question a court must ask is "whether the officer's action ... was reasonably related in scope to the circumstances which justified the interference in

the first place." *Id.* 392 U.S. at 20, 88 S.Ct. at 1879.

Although *Terry* was concerned with searches, the Supreme Court has employed the same analysis of stops of persons. *See, e.g., United States v. Cortez,* 449 U.S. 411, 421, 101 S.Ct. 690, 696, 66 L.Ed.2d 621 (1981); *Brown v. Texas,* 443 U.S. at 52, 99 S.Ct. at 2641; *Delaware v. Prouse,* 440 U.S. at 653–54, 99 S.Ct. at 1395–96; *United States v. Brignoni-Ponce,* 422 U.S. at 884, 95 S.Ct. at 2581; *Adams v. Williams,* 407 U.S. at 145–46, 92 S.Ct. at 1922–23. These cases hold that the degree of intrusiveness of stops that do not rise to the level of arrests may vary, and in order to be lawful in a given case it must be proportional to the degree of suspicion that prompted the intrusion. When little or no suspicion exists, therefore, very little intrusion is tolerable. *Brown v. Texas,* 443 U.S. at 52, 99 S.Ct. at 2641, strongly states this principle of proportionality:

> In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference.... [E]ven assuming that [a strong social] purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

*See also Florida v. Royer,* —— U.S. at ——, 103 S.Ct. at 1325 ("The scope of the detention must be carefully tailored to its underlying justification.") (plurality opinion); *Delaware v. Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396 ("the permissibility of a particular law enforcement practice is judged by

---

2. Although we need not reach the issue of whether Berryman consented to this search because of our conclusion that the illegality occurred earlier, we note that in denying the motion to suppress the district judge did not mention Agent Lemon's testimony that Berry-

man had been advised that he could refuse to open his suitcase. Because this testimony was inferentially contradicted by the defendant, we could not, were we to decide the consent issue, include it as a fact to be given any weight absent a finding by the district court.

balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests"); *United States v. Bautista,* 684 F.2d at 1290 (prolonged questions must be "related in scope to the justification for their initiation") (quoting *United States v. Brignoni-Ponce,* 422 U.S. at 881, 95 S.Ct. at 2580, quoting *Terry v. Ohio,* 392 U.S. at 29, 88 S.Ct. at 1884); *United States v. Ramirez-Cifuentes,* 682 F.2d 337, 343 (2d Cir.1982) (court must "carefully measure[ ] the need for the stop against the nature of the intrusion suffered"); *United States v. Nembhard,* 676 F.2d 193, 202 (6th Cir.1982) (reasonableness of a stop is dependent on balance of public interest and private right to be free from arbitrary interference); *United States v. Streifel,* 665 F.2d 414, 422 (2d Cir.1981) ("[A]n officer having a reasonable suspicion, based on articulable, objective facts, that criminal activity is afoot may make an investigatory stop that is reasonable both in its duration and its intrusiveness.... In balancing the government's law enforcement interests, it is generally true that the more intrusive the stop, the stronger the justification must be ... and that 'if probable cause is lacking, the intrusion must be no greater than the circumstances require' ") (quoting *United States v. Vasquez,* 638 F.2d 507, 520 (2d Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981), 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981)); *United States v. Viegas,* 639 F.2d at 45 ("The facts before the agents ... adequately justified the initial inquiry.... The slight intrusion of this encounter was supported by the [defendants'] evasive actions in the airport ...."); *United States v. Dodier,* 630 F.2d 232, 234–35 (4th Cir.1980) ("The minimal intrusion on privacy rights by an investigative stop is permissible if 'the police officer [can] point to specific and articulable facts which ... reasonably warrant that intrusion' ") (quoting *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1879).

Whether an investigatory stop of limited intrusiveness is controlled by the fourth amendment therefore depends on the justification for even that limited intru-sion. This rule is rooted in the Court's interpretation of the fourth amendment as embodying the dual concerns of protecting privacy interests and avoiding arbitrary official action. *See Michigan v. Summers,* 452 U.S. 692, 701 & n. 14, 101 S.Ct. 2587, 2593 & n. 14, 69 L.Ed.2d 340 (1981); *Reid v. Georgia,* 448 U.S. at 441, 100 S.Ct. at 2754; *Brown v. Texas,* 443 U.S. at 51, 99 S.Ct. at 2640 (fourth amendment "assure[s] that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field"); *Delaware v. Prouse,* 440 U.S. at 654, 661, 662–63, 99 S.Ct. at 1396, 1400–01; *United States v. Brignoni-Ponce,* 422 U.S. at 882, 95 S.Ct. at 2580; *Terry v. Ohio,* 392 U.S. at 14 & nn. 11, 15, 21–22, 88 S.Ct. at 1876 & n. 11, 1876, 1879–80. If the threshold fourth amendment inquiry were limited to consideration of the physical circumstances of the stop, apart from the justification for the officers' approach, the officers' discretion to make arbitrary or discriminatory stops would be unfettered. *See* A Model Code of Pre-Arraignment Procedure § 110.2(1)(a) & Commentary 262–63, 269–70, 273, 276–77 (1975).

It is important to remember that *Terry* stops are valid only because of an exception to the usual rule requiring "advance judicial approval of searches and seizures through the warrant procedure." *Id.* at 20, 88 S.Ct. at 1879; *see also Florida v. Royer,* —— U.S. at ——, 103 S.Ct. at 1324 (plurality opinion). The exceptions to this general rule are motivated by necessity but are limited by the requirement that judicial approval be available after the fact if it is impossible in advance:

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.

*Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1880 (footnote omitted). Because reviewa-

bility is central to the scheme of this exception to the warrant requirement, declining to examine the justification for police conduct would be to abdicate a responsibility and to invite arbitrariness.

It is true that the Supreme Court has noted that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Reid v. Georgia,* 448 U.S. at 440 n. *, 100 S.Ct. at 2753 n. *; *Terry v. Ohio,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16; *see also Florida v. Royer,* ——— U.S. at ———, 103 S.Ct. at 1324 (plurality opinion). Asking a passerby for directions, *see United States v. Viegas,* 639 F.2d at 44, or questioning possible witnesses of a crime, *see* A Model Code of Pre-Arraignment Procedure § 110.2(1)(b) (1975), for example, may invoke no fourth amendment concerns. The reason for these exceptions, however, is not that "the law does not concern itself with trifles"; it is because these situations, unlike inherently confrontational ones, do not pose any risk of arbitrary or abusive exercise of discretion. But whenever an officer identifies himself as a drug enforcement agent and singles out an individual for questioning, the implication of suspicion and the potential for abuse are clear.

This is not to say that all intrusions, no matter how minimal, in which the risk of arbitrariness is present must be justified by a uniform degree of suspicion. Such a rule was rejected in *Terry v. Ohio,* 392 U.S. at 16–19, 88 S.Ct. at 1877–78. Rather, the test is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Id.* at 19, 88 S.Ct. at 1878. Less suspicion is required to initiate a minor intrusion, therefore, than to justify a more severe restriction on liberty.

■ In assessing reasonableness the court must weigh the importance of the governmental and individual interests. *See Michigan v. Summers,* 452 U.S. at 702, 101 S.Ct. at 2594. It is not enough to say that, in a case like the present one, the limited nature of the intrusion makes the individual interest inconsequential when compared with the government's overwhelming interest in controlling drug trafficking. If the government's general interest were at issue, it would outweigh almost any individual interest and stretch fourth amendment protections wafer thin. That kind of balancing, however, is improper because the court's duty is to "evaluate the reasonableness of a particular ... seizure in light of the *particular* circumstances." *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1880 (emphasis added); *see* A Model Code of Pre-Arraignment Procedure, Commentary 276–77 (1975). When an officer cannot articulate suspicions concerning a particular individual, the government's interest in controlling drug trafficking by that individual is small. *Brown v. Texas,* 443 U.S. at 52, 99 S.Ct. at 2641. In fact, the government then has an interest in avoiding arbitrariness.

■ In the present case the intrusion was limited, but the DEA agents were unable to articulate any reason to justify any degree of intrusion. This situation is therefore distinguishable from other cases in which this court has held minimal intrusions not to be violative of the fourth amendment when such interference was reasonable in light of the officers' articulated suspicions. *See, e.g., United States v. Regan,* 687 F.2d 531, 536 (1st Cir.1982); *United States v. Jodoin,* 672 F.2d at 234–35; *United States v. Viegas,* 639 F.2d at 45; *United States v. Rodriguez Perez,* 625 F.2d 1021, 1026 (1st Cir.1980). It is also distinguishable from *United States v. West,* 651 F.2d at 72–74, in which this court found it unnecessary to consider the reasonableness of the officers' suspicions, because the defendant in that case actually left, demonstrating that his liberty was not even minimally intruded upon.

We conclude that Berryman's fourth amendment right to be free from arbitrary interference was violated, and that the evidence obtained as a result of this illegality should have been suppressed. *See Terry v. Ohio,* 392 U.S. at 29, 88 S.Ct. at 1884; *Wong Sun v. United States,* 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963); *United States v. Gooding,* 695 F.2d at 84.

We therefore reverse the judgment of the district court.

REVERSED.

BREYER, Circuit Judge (dissenting).

I dissent because I believe that the panel's result is unsound as a matter of Fourth Amendment policy and contrary to controlling precedent.

We agree about the facts. Two DEA agents initially became suspicious of Berryman because he fit their "drug courier profile." He arrived at Logan Airport from a "source" city, he looked nervous, he walked rapidly from the plane to the luggage area, he scanned the baggage claim area, and he had only a little luggage. On the basis of these few facts (and whatever insight their experience and intuition may have added) the DEA agents, in the words of the defendant, "approached me, ... identified themselves as DEA agents, ... explained to me they were drug enforcement people .... [and] asked if they could speak to me." Berryman *agreed.*

The agents' initial questioning revealed that Berryman had been in Florida three days and returned on a one-way ticket for which he had paid cash—facts that brought him more squarely within the "drug courier profile." Berryman also said that he did not buy round-trip tickets for short business trips because he liked to buy one-way tickets. He added that he had gone to Florida to discuss a land deal in Alaska. And, he agreed to let the officers look through his luggage (a consent which the district judge held was "freely and voluntarily given").

In looking through the suitcase one agent moved a gift wrapped package, which Berryman said someone had entrusted to him and probably contained a toy. The agent testified:

I was told there was possibly a toy in there. There was nothing solid in there I could feel. A very powdery, chunky substance.

He also described it as having "a soft mushy-type feeling with chunks." One of the agents said that at this point he subjec-

tively believed that he would not allow Berryman to leave. Berryman then went with the agents to the security area where they x-rayed the package. And, he waited outside the baggage claim office while one of the agents opened the package and found cocaine.

I have been unable to find any controlling precedent that has found a Fourth Amendment violation on facts like these. And, I have found numerous cases that expressly or impliedly hold the contrary. *See, e.g., Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (*per curiam*); *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Regan,* 687 F.2d 531 (1st Cir.1982); *United States v. Jodoin,* 672 F.2d 232 (1st Cir.1982); *United States v. West,* 651 F.2d 71 (1st Cir.1981), *vacated on other grounds,* —— U.S. ——, 103 S.Ct. 3528, 77 L.Ed.2d 1382 (1983); *United States v. Viegas,* 639 F.2d 42 (1st Cir.), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981). But let me be more specific.

1. First, consider the agents' initial approach and questioning. Part II–B of the panel's opinion suggests that the agents could not constitutionally approach Berryman as they did and ask him if he would answer some questions. This suggestion is contrary to the statement of Justice White, and seven other Supreme Court Justices, in *Florida v. Royer, supra.* In *Royer,* the Court held that:

law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.

—— U.S. at ——–——, 103 S.Ct. at 1324; *accord Reid v. Georgia,* 448 U.S. at 440 n. *, 100 S.Ct. at 2753 n. *; *United States v. Mendenhall,* 446 U.S. at 552, 100 S.Ct. at 1876 (opinion of Stewart, J.); *Terry v. Ohio,*

392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968); *United States v. Regan,* 687 F.2d at 535; *United States v. Jodoin,* 672 F.2d at 234; *United States v. West,* 651 F.2d at 72–73.

For the most part, the courts have reasoned that if officers ask for and receive permission to question a person there is no "seizure" within the terms of the Fourth Amendment. In determining whether a person has been seized, this circuit has explicitly followed the rule that Justice Stewart articulated in *United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (plurality opinion):

> a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

*See United States v. West,* 651 F.2d at 72; *United States v. Viegas,* 639 F.2d at 44. This rule, as applied to this case, means that there was "no seizure" before the agents found the package, and quite possible even thereafter.

But, even if we were to consider an agent's *voluntary* questioning a Fourth Amendment "seizure"—as Judge Swygert does here and in his *dissents* in *United States v. Black,* 675 F.2d 129, 139 (7th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); and *United States v. Moya,* 704 F.2d 337, 344 (7th Cir. 1983)—the Fourth Amendment would still not forbid it. The Fourth Amendment forbids *unreasonable* seizures. "Reasonableness" is a matter of interest balancing. Here, the police interest in *voluntary* questioning is great. To hold that the police cannot even ask voluntary questions of those who strike them as knowledgeable or suspicious would severely interfere with their ability to detect or investigate burglaries, murders, drug traffic and other crimes. *United States v. Mendenhall,* 446 U.S. at 561, 100 S.Ct. at 1880 (Powell, J., concurring) ("The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit."); *United*

*States v. Berry,* 670 F.2d 583, 595 (5th Cir. 1982) (*en banc*) ("Informing our police that they cannot approach citizens to enlist their voluntary support in ending this [drug] trade may be tantamount to preventing its interdiction at all."); Wilson & Kelling, *Broken Windows,* Atlantic, March 1982, at 29 (importance of police-citizen contact for "order-maintenance" and the preservation of communities). At the same time, the privacy interest at issue is minimal. While many of those questioned may feel "pressure" to cooperate, most will not mind helping the police investigate. Those who do mind can always answer the query "May I ask you some questions?" with the word "no." In other words, to force the police to give up the practice of polite, *voluntary* questioning would threaten serious harm to the public interest in safety and effective law enforcement; to impose the duty upon an unwilling citizen to answer "no" would burden privacy interests only slightly. Thus, it does not surprise me that so many courts have rejected the per se condemnation of voluntary airport questioning implicitly advanced by Judge Swygert here and in his dissents to *United States v. Black,* 675 F.2d at 139 ("Police encounters that involve investigative questioning that focuses on the person being stopped are inherently coercive.") (Swygert, J., dissenting), and *United States v. Moya,* 704 F.2d at 344 ("Whether an investigatory stop of limited intrusiveness is controlled by the Fourth Amendment therefore depends on the justification for even that limited intrusion.") (Swygert, J., dissenting). *See, e.g., United States v. Moya, supra* (no seizure where police agent approaches an individual, identifies himself as an agent, and asks questions which the individual need not answer); *United States v. Collis,* 699 F.2d 832 (6th Cir.1983) (same); *United States v. Tolbert,* 692 F.2d 1041 (6th Cir.1982) (same); *United States v. Moore,* 675 F.2d 802 (6th Cir.1982) (same), *cert. denied,* —— U.S. ——, 103 S.Ct. 1521, 75 L.Ed.2d 945 (1983); *United States v. Berry,* 670 F.2d 583 (5th Cir.1982) (*en banc*) (same); *United States v. Sanford,* 658 F.2d 342 (5th Cir. 1981) (same), *cert. denied,* 455 U.S. 991, 102

S.Ct. 1618, 71 L.Ed.2d 852 (1982); *United States v. Setzer,* 654 F.2d 354 (5th Cir.1981) (same), *cert. denied,* —— U.S. ——, 103 S.Ct. 457, 74 L.Ed.2d 609 (1982); *United States v. Smith,* 649 F.2d 305 (5th Cir.1981) (same); *United States v. Williams,* 647 F.2d 588 (5th Cir.1981) (*per curiam*) (same); *United States v. Moeller,* 644 F.2d 518 (5th Cir.) (same), *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981); *United States v. Herbst,* 641 F.2d 1161 (5th Cir.) (same), *cert. denied,* 454 U.S. 851, 102 S.Ct. 292, 70 L.Ed.2d 141 (1981); *United States v. Berd,* 634 F.2d 979 (5th Cir.1981) (same); *United States v. Pulvano,* 629 F.2d 1151 (5th Cir.1980) (same); *United States v. Fry,* 622 F.2d 1218 (5th Cir.1980) (*per curiam*) (same); *United States v. Elmore,* 595 F.2d 1036 (5th Cir.1979) (same), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).

The panel seeks to escape these cases and principles in two ways, neither of which seems satisfactory. First, it may believe that the agents erred in not specifically telling Berryman that he did not have to answer their questions. That is to say, the panel may allow voluntary questioning if, but only if, the police not only ask permission to question an individual but also add the words "you need not answer." Whatever the merits of this approach, no other court has adopted it. The Supreme Court in *Royer* upheld the initial questioning without any such warning, and this circuit similarly upheld airport questioning in *Jodoin, Regan,* and *West,* without mentioning a warning. Thus, for us to impose another "*Miranda* warning" type of requirement on police questioning seems unwise, at least without first hearing argument about its implications.

Second, the majority may believe there is something special about the initial questioning in this case that distinguishes it from the precedent I have cited. If so, I fail to find it. In *United States v. Regan,* 687 F.2d at 535, for example, this court permitted voluntary questioning under circumstances described as follows:

The district court found that the two agents, dressed in business suits, approached defendant as he was walking towards the exit; that they displayed no weapons; that they did not order him to stop or the like; that he said "sure" when asked if he would speak with them; and that while an agent assumed a position on either side of him; they did not block his path, touch him, or in any way physically restrain his freedom of movement.

In this case, the agents testified that they were dressed in suits; that they approached Berryman just outside of the terminal; that they did not display their weapons; that they did not order Berryman to stop; that Berryman said he "didn't mind" speaking with them and never asked if he could leave; and that, while the agents stood on either side of Berryman, they did not block his path (contrary to the majority's suggestion at p. 1245), touch him, or restrain his movement. There may be a difference, but if so it takes the judicial equivalent of Mozart's musical ear to detect it.

Of course, the panel properly emphasizes the fact that the district court erred in finding that the agents explicitly told Berryman that he need not answer, for there is no testimony to this effect in the record. This error, however, does not warrant the panel's rejecting the district court's decision to accept the agents' testimony about everything else that occurred. Credibility is a matter for the district court. *See, e.g., Jackson v. United States,* 353 F.2d 862, 865 (D.C.Cir.1965); *Marsh v. United States,* 29 F.2d 172, 173 (2d Cir.) (L. Hand, J.), *appeal dismissed,* 277 U.S. 611, 48 S.Ct. 563, 72 L.Ed. 1015 (1928), *and cert. denied,* 279 U.S. 849, 49 S.Ct. 346, 73 L.Ed. 992 (1929). If the panel believes that its failure to find support for one of the district court's factual findings fatally infects all its other findings, then a remand is called for, not reversal. *See, e.g., United States v. Heimforth,* 493 F.2d 970, 972 (9th Cir.), *cert. denied,* 416 U.S. 908, 94 S.Ct. 1615, 40 L.Ed.2d 113 (1974); *United States v. Sicilia,* 457 F.2d 787, 788 (7th Cir.1972) (*per curiam*), *cert. denied,* 414 U.S. 865, 94 S.Ct. 123, 38

L.Ed.2d 117 (1973); *United States v. Greely,* 425 F.2d 592 (D.C.Cir.1970).

2. Next, consider whether any events subsequent to the agents' initial questioning change the result. The panel suggests that even if the initial questioning were proper, the agents were not justified in prolonging their questioning of Berryman or in x-raying his package. However, whether a seizure ever took place prior to the time the agents opened the package is doubtful. One of the agents testified that once he felt the powder, he *subjectively* believed that he would not let Berryman depart, while the other agent stated that even after the package had been x-rayed, "[a]s far as I was concerned [Berryman] was free to go at that time." And, in any case, our test of whether there has been a seizure is an objective one: "how the objective facts would appear to a reasonable person." *United States v. Viegas,* 639 F.2d at 44; *see United States v. West,* 651 F.2d at 72.

Regardless, even if Berryman was "seized" in the course of the questioning, a temporary seizure of the type at issue here is lawful if the police have "a reasonable and articulable suspicion that the person seized [was] engaged in criminal activity." *Reid v. Georgia,* 448 U.S. at 440, 100 S.Ct. at 2753; *see Florida v. Royer,* —— U.S. at ——, 103 S.Ct. at 1324 (opinion of White, J.) ("articulable suspicion that a person has committed or is about to commit a crime"); *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1879 ("specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"); *United States v. Regan,* 687 F.2d at 536 ("reasonable and articulable suspicion"); *United States v. Viegas,* 639 F.2d at 44–45. By the time Berryman had answered a very few questions, there was ample ground for reasonable suspicion. The majority states that "Berryman's answers to the initial questions in the present case did not create suspicion when none existed before." But, how can this be so? Did not the facts: (1) that Berryman paid for a business-trip ticket in cash; (2) that Berryman used one-way tickets for a short round-trip flight and said he preferred to

fly on one-way tickets; and (3) that Berryman said he flew to Florida to talk about a land deal in Alaska, all reasonably increase the agents' *suspicion?* If not, I do not understand how the word "suspicion" is used.

As to whether the agents had reasonable suspicion to x-ray the package, the answer is even clearer. By the time the agents went to x-ray the package they had, in addition to noting the suspicious circumstances cited above, felt lumpy powder in a package that Berryman said someone in Florida had given him and which he said probably contained a toy. I should think that this amounts to "reasonable suspicion" —perhaps even to "probable cause." *See, e.g., United States v. Waltzer,* 682 F.2d 370, 372 (2d Cir.1982) (probable cause found in airport investigation); *United States v. Corbitt,* 675 F.2d 626, 629 (4th Cir.1982) (same).

3. *Florida v. Royer, supra,* does not help the panel, for this case differs from *Royer* in every relevant respect. The *cause* for detention here included Berryman's having told the agents that he went to Florida to negotiate a deal about Alaskan land and the agents having physically felt a powder-like substance; in *Royer,* it consisted only of a "nervous young man paying cash for a ticket to New York City under an assumed name and carrying two heavy American Tourister bags...." *Florida v. Royer,* —— U.S. at ——, 103 S.Ct. at 1329. The *detention* here consisted of having Berryman answer questions in public, having Berryman follow the agents to an x-ray machine, and then having him wait outside the Delta Airlines baggage office. In *Royer,* it consisted of bringing Royer to a "police interrogation room" which was "a small room—a large closet—equipped with a desk and two chairs." *Id.* at ——, 103 S.Ct. at 1327. Finally, in *Royer,* the Court found that the "officers' conduct was more intrusive than necessary to effectuate an investigative detention," in part because the officers did not "return[ ] his ticket and driver's license, and inform[ ] him that he was free to go if he so desired...." *Id.* Here the agents

never moved Berryman to an interrogation room, did not keep his ticket and driver's license, and told him at the end of the proceedings that he was free to go though he might later be arrested. In sum, this case does not contain the elements on which the *Royer* Court relied in finding a Fourth Amendment violation; it does contain the elements that the *Royer* Court suggested would show a lack of such a violation; and the panel's holding seems to me to violate the rules governing "airport seizures" set out in the nearly unanimous Part II of the *Royer* case.

For these reasons, I dissent.