[No. 46784. En Banc. October 2, 1980.]

THE STATE OF WASHINGTON, *Respondent,* v. GARY E. HOBART, *Petitioner.*

438

*James R. Short* and *Short & DeBay, P.S.,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Gordon S. Jones* and *Marc Boman, Deputies,* for respondent.

ROSELLINI, J.—The petitioner was charged with possession of controlled substances and pleaded guilty after the court denied his motion to suppress the State's evidence,

reserving his right to appeal the ruling. That denial was affirmed by the Court of Appeals, Division One, *State v. Hobart*, 24 Wn. App. 240, 600 P.2d 660 (1979).

The evidence which the petitioner sought to suppress was seized when officers stopped him for questioning at 1:30 on the morning of October 18, 1977. The stop came about in the following manner: Two police officers, in their marked patrol car, were proceeding east on Madison Street on Seattle's First Hill when they observed an approaching Plymouth Valiant "quickly" turn north onto Summit Avenue when it was about a block away from them. They decided to follow the vehicle to see if they could ascertain the reason for the turn. It proceeded slowly (about 20 miles per hour) until it reached University Street, turned east, proceeded 1 block, then turned south on Boylston Avenue where it entered a parking lot serving the Arcadia Apartments, which had an entrance on University Street. The petitioner parked his car and walked to the door of the apartment building, the patrol car close behind him. He shook the front door, received no answer, looked up at the second story windows and started walking back toward his car. At this moment Officer Dornay, who had pulled the patrol car up at the curb in front of the apartment house, called to him, asking if he were lost. The petitioner answered no, and said that he was meeting a girlfriend. The petitioner was standing a few feet from the officer at the time.

At that moment Officer Dornay recognized the petitioner as a person he had arrested in 1972 for possession of marijuana and cocaine and again in 1974 for carrying a concealed weapon.[1] He stated that because of the petitioner's record and for his own safety, he got out of the car, asked for identification, and "patted" the petitioner for weapons. He found none, but did detect in the petitioner's shirt

---

[1] No charges were filed as a result of the narcotics arrest. The 1974 arrest resulted in a conviction, the evidence showing that a handgun was found on the seat beside the petitioner in the car which he was driving.

pocket two spongy objects which he squeezed and concluded were balloons containing narcotics.

In the meantime Officer Dornay's colleague had radioed to learn if there were any warrants out for the petitioner's arrest. Receiving a negative report, Dornay so advised the petitioner and returned his driver license to him. As he did so he asked the petitioner if "that was cocaine in his pocket." The petitioner reached for his pocket and the officer, fearing he was preparing to swallow the balloons, grabbed his hand and, in the scuffle which ensued, pulled him backward onto the ground. After he was handcuffed, balloons containing heroin and cocaine were found on the grass in the area in which the scuffle had occurred.

While the scuffle was taking place, a young woman appeared at the scene, as did one or more other persons. She demanded to know what the officers were doing, and was told to stay back. At the suppression hearing, the petitioner stated that this was the woman with whom he had made a date for breakfast; that she worked at the YWCA and that she got off from work around 12:30.

The fourth amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It is the contention of the petitioner that the officers' conduct in this case did not conform to the requirements of this amendment, as interpreted by the Supreme Court of the United States.

While, on its face, the amendment could be read as prohibiting any search or seizure not authorized by a warrant issued upon probable cause, the Supreme Court, recognizing the practical necessities of law enforcement, has held that a warrantless arrest can be made, provided that there is probable cause to believe that the suspect had committed

or was committing an offense. *Beck v. Ohio,* 379 U.S. 89, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964). In *Wong Sun v. United States,* 371 U.S. 471, 479–84, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), it was said that the requirements of reliability and particularity of information upon which a police officer acts are at least as strong where a warrant is absent as they are where one has been obtained.

██ The Supreme Court has approved certain limited exceptions to the requirements of probable cause for searches or seizures. The exception which is relied upon by the prosecution in this case is that which was delineated in *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The question before the court there was the legality of the police practice of stopping and "frisking" persons suspected of criminal activity. Recognizing the public interest in the investigation and prevention of crime, the court found that the Fourth Amendment tolerates "stops" which are less intrusive than arrests, where less than probable cause for arrest is present. An officer may briefly detain for limited questioning a person whom he reasonably suspects of criminal activity and may frisk the person for weapons, provided the officer has reasonable grounds to believe that he is armed and dangerous. This right is accorded in order that the officer may protect himself and others from physical harm, and its scope is strictly limited to the purpose for which it is permitted.

In *Sibron v. New York,* 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968), the court said that before an officer places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so, and that in the case of the self–protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. There, an officer had thrust his hand into the pocket of a person suspected of possessing narcotics. The Supreme Court noted that there were no circumstances warranting a belief that the defendant was armed and dangerous, and therefore a search for

weapons was not justified. Further, the court said, the search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as objects of assault. The search in the *Sibron* case was found to have been aimed at the discovery of narcotics, and was not limited in scope to the only goal which might have justified its inception—the protection of the officer.

The United States Supreme Court has more recently defined the circumstances under which an officer is justified in stopping an individual and requesting identification. In *Brown v. Texas,* 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979), the court held invalid the application of a Texas statute which made it a crime to refuse to identify oneself when asked to do so by an officer, where the officer confronting the defendant lacked any reasonable ground to believe that the appellant was engaged in or had engaged in criminal conduct.

In that case officers observed the defendant in an area of high drug traffic. He appeared to have been meeting with or about to meet with another man in the alley, and he started to walk away as the officers came on the scene. The court noted that the officers did not claim to suspect the appellant of any specific misconduct, nor did they have any reason to believe that he was armed. When the defendant refused to identify himself, the officers frisked him but found nothing. They arrested him, nevertheless, and he was charged with a violation of the statute which made it a crime to refuse to identify oneself.

Declaring that when an officer accosts an individual and restrains his freedom to walk away, he performs a seizure of that person within the meaning of the Fourth Amendment, the court noted that such seizures, though less intrusive then an arrest, must be reasonable. Such reasonableness depends upon a balance between the public interest in law enforcement and the individual's right to personal security,

free from arbitrary interferences by law officers.[2] Constitutionality of such seizures involves the weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. And, the court said, a central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers (citing *Delaware v. Prouse,* 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979); and *United States v. Martinez–Fuerte,* 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976)).

There, as here, it was not contended that the officers stopped the defendant pursuant to a practice embodying neutral criteria, but rather it was urged that the officers were justified in stopping him because they had a "'reasonable, articulable suspicion that a crime had just been, was being, or was about to be committed.'" *Brown v. Texas, supra* at 51. The court acknowledged that under some circumstances a suspect may be detained briefly for questioning, even though probable cause for arrest may be absent, but that such a detention must be supported by a reasonable suspicion, based on objective facts, that the individual is engaged in criminal activity. *Cf. State v. Gluck,* 83 Wn.2d 424, 518 P.2d 703 (1974).

---

[2] We might add that there is likewise an impelling public interest in the right of people generally to be free of unreasonable searches and seizures. See a monumental exposition upon the subject of the Fourth Amendment by Professor Anthony G. Amsterdam, delivering the Oliver Wendell Holmes Lectures at the University of Minnesota Law School in January 1974. It appears in 58 Minn. L. Rev. 349 (1974) under the title, *Perspectives on the Fourth Amendment.*

In *Brown,* the defendant had been seen in an apparent encounter with another man in an alley, in an area where drug traffic was high. The encounter appeared to have been aborted by the arrival of the officers. The officers thought he "looked suspicious." Nevertheless, the court held that these circumstances were as consistent with innocence as with guilt and did not give rise to a reasonable suspicion that he was guilty of misconduct. The absence of any basis for suspecting the defendant of criminal activity, the court said, caused the balance between the public interest in law enforcement and the defendant's right to privacy to tip in favor of the latter.

Applying the principles of these cases to the case at hand, we first take note of the fact that the events occurred late at night. However, there was no evidence that the events occurred in an area with a high incidence of crime or that any crime was under investigation. Officer Dornay's attention was first attracted to the petitioner by the fact that his vehicle turned "quickly" as it came in sight. It was not suggested that he failed to signal or that the turn was executed unlawfully. In fact, there was no traffic violation involved in the petitioner's driving. Under our holding in *State v. Larson,* 93 Wn.2d 638, 611 P.2d 771 (1980), the officers would not have been justified in stopping the defendant while he was lawfully operating his vehicle, assuming there was no other appearance of criminal activity.

To the layman, a decision to turn instead of proceeding on can be engendered by any number of circumstances, including the realization by the driver that he has reached or passed the street for which he is looking. This was the defendant's explanation in this case. In the absence of a showing that, in the experience of law enforcement officers, such turns indicate probable criminal conduct on the part of the driver, an assumption that such is the case is necessarily rested on speculation. And in fact, Officer Dornay's testimony revealed that the decision to follow the vehicle was inspired by curiosity rather than suspicion.

There is no rule which prohibits an officer from following a vehicle which has aroused his curiosity. The question remains whether the subsequent conduct of the petitioner afforded a basis for a reasonable suspicion that he was engaged in or had engaged in criminal activity.

If there was anything suspicious in the fact that he drove slowly, with the patrol car in full view,[3] the significance of such driving was not explained by the officer other than to term it "cautious." Nor was the significance which he attached to the fact that the defendant parked his car in a parking lot, with the patrol car still in view, walked to the door of an apartment house and tried the door, looked up at the windows, and started back to his car. Officer Dornay stated that he was concerned about the defendant "trying doors in the neighborhood" and the fact that he apparently did not have a key. He did not, however, testify that the defendant appeared to be bent upon any criminal activity, specific or general.

The defendant's explanation of his driving was that his girlfriend had recently moved to the Arcadia Apartments, and that he was looking for the address which she had given him; that when he found the door locked, he started back to his car to wait for her to arrive home from work. Whether or not this was the true explanation of his movements, it was not altogether implausible.

Whether the officer would have accepted the explanation and allowed the defendant to go on his way, had he not recognized him as a person with whom he had previous contact, is not revealed in the record. The record does reveal, however, that he was aware that he did not have probable cause to arrest the defendant.

There had been nothing menacing in the defendant's demeanor, and he had made no furtive gestures. Nevertheless, Officer Dornay, upon recognizing him, concluded that

---

[3]The officer assumed that the defendant had spotted his patrol car when he made the "quick turn". He acknowledged that his car was always close and visible to the defendant.

he should conduct a search of his person "because of his record" and for the officers' own safety.

██ Under *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), such a search is permissible if the officer has reason to believe that the individual whom he accosts is armed and *presently* dangerous. There was only one basis for Officer Dornay's belief that the defendant was armed and dangerous. That was the fact that 3 years previously he had been found with a weapon in his car. While arguably this was not a sufficient reason to suppose that he was presently dangerous, we will assume that at that point Officer Dornay had a reasonable suspicion that the petitioner was engaged in criminal conduct and reasonable grounds to believe that the defendant was armed and *presently* dangerous. If so, he was justified in conducting a "pat down" for weapons.

However, from his own description of the search which he made, it is evident that its scope was not strictly limited to a search for weapons, but included also an exploration of the possibility that the defendant might be in possession of narcotics. Having discovered "spongy" objects (which could not reasonably be feared as dangerous weapons) in the defendant's pockets, the officer squeezed them, with the obvious purpose of ascertaining whether they had the shape and consistency of balloons commonly used for narcotics. Such a search reaches beyond the scope permitted under the Fourth Amendment, adding to the search for weapons a search for evidence of a crime.

While the 1972 arrest for narcotics possession may have given the officer some reason to suspect that the defendant was presently in possession of such substances, it fell considerably short of probable cause to believe that a crime was being committed, as he implicitly concedes, and thus gave him no ground for a search without a warrant. If a prior conviction, not to mention a prior arrest, should afford grounds for believing that an individual is engaging in criminal activity at any given time thereafter, that person would never be free of harassment, no matter how

completely he had reformed.[4] To the best of our knowledge, the law does not countenance such an assumption.

We are aware of no instance in which the Supreme Court has condoned the use of a "frisk" to search for evidence of an independent crime.[5] All of its pronouncements have made it clear that such a warrantless personal intrusion is justified only to assure the safety of the officer and others. To approve the use of evidence of some offense unrelated to weapons would be to invite the use of weapons' searches as a pretext for unwarranted searches, and thus to severely erode the protection of the Fourth Amendment. Such a step this court is not prepared to take.

■ Here the officer, being suspicious that the petitioner had narcotics in his pockets, used the knowledge he had gained from the search to elicit a nonverbal and involuntary admission that such was the case, and in the due course of events, to gain possession of the evidence. Where the original search is illegal, the government cannot claim any advantage which it gained on the subject of the pursuit by doing the illegal act. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182, 24 A.L.R. 1426 (1920).

The decision of the Court of Appeals is reversed and the cause is remanded to the Superior Court with directions to grant the motion to suppress the evidence.

UTTER, C.J., and STAFFORD, WRIGHT, BRACHTENBACH, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.

---

[4]To sanction such an assumption would also necessitate a judicial finding that the criminal justice system acts neither as a deterrent nor a rehabilitative force.

[5]If a weapon is found in the "pat down," the person may be arrested and a further search, including a search for evidence of crime, may be conducted as an incident thereto. *Adams v. Williams,* 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972).