[No. 56416-7.    En Banc.    February 6, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. DARRON W. BARBER, *Petitioner*.

*Norm Maleng, Prosecuting Attorney,* and *Timothy Michael Blood, Deputy,* for petitioner.

*Jesse Wm. Barton* of *Washington Appellate Defender Association,* for respondent.

*Jeffrey L. Needle* on behalf of American Civil Liberties Union, amicus curiae for respondent.

ANDERSEN, J. —

## FACTS OF CASE

At issue in this case is whether racial incongruity, *i.e.*, a person of any race being allegedly "out of place" in a particular geographic area, can ever constitute a finding of reasonable suspicion of criminal behavior; we hold that it cannot.

On the evening in question, a police officer observed three young men walking along the 13300 block of Northeast Eighth Street in Bellevue, Washington. One of the three was carrying a bundle wrapped in a blanket, another a brown paper bag and the third (the defendant, Darron W. Barber) a duffel bag. The bags appeared to be filled with objects of some kind. After the officer drove past, he continued to observe the three, then made a U-turn, drove back, stopped and began questioning them. As was to develop, the three men were burglars carrying loot taken in a recent residential burglary.

The defendant, Darron W. Barber, was very shortly thereafter arrested and charged with burglary in the second

degree and possession of stolen property in the second degree. In the trial court, he challenged the legality of the officer stopping him as well as the legality of his arrest, and moved to suppress the evidence seized by the police at the time of the arrest.

At the suppression hearing before the trial court, testimony was taken. Pursuant to the Superior Court Criminal Rules,[1] the trial court entered findings of fact and conclusions of law. Therein the trial court detailed the facts of the case and the conclusions it drew therefrom, and denied defendant's motion to suppress. To understand this case, it is first necessary to have the trial court's findings and conclusions before us. They are as follows:[2]

## I.
### THE UNDISPUTED FACTS

1. On May 25, 1987, at approximately 8:00 p.m., Officer Jim Hershey of the Bellevue Police Department was on patrol in Bellevue in King County, Washington. At that time he was heading westbound on Northeast Eighth Street in the 13300 block in his patrol vehicle. Officer Hershey is black.

2. As he proceeded down the hillside, Officer Hershey's attention was drawn to three black males walking westbound on the north shoulder of the roadway. Each of the three was carrying a package of some sort. One of the males was carrying a multi-colored blanket which appeared to be covering a large bundle. Another of the males was carrying a large blue duffel bag which appeared to be filled with objects. The third male was carrying a brown paper bag. As he drove past the three, they noticed Officer Hershey and began glancing at him and each other.

3. Upon passing the three males, Officer Hershey kept an eye on them through his rear view mirror. The three continued to glance at him and then at each other. Through his mirror, Officer Hershey then observed the male carrying the blanketed bundle heave the bundle into some brush just off the shoulder of the roadway. When thrown, the contents of the blanket appeared to be of substantial weight, as the bundle did not fall very far into the brush despite what appeared to be a fair amount of exertion by the male throwing the bundle.

---

[1]CrR 3.6.

[2]Findings of fact and conclusions of law relating to 3.6 of the Superior Court Criminal Rules (hereinafter Findings and Conclusions).

4. Beside the fact that the male's act constituted littering, Officer Hershey regarded that act and his observations up to that point as unusual and suspicious. Further, it had been his experience on the previous occasions that when a person is carrying a bundle within a blanket on a street, the items covered are usually the fruits of a recent burglary.

5. At that point, Officer Hershey made a U-turn and contacted the three males approximately 40 to 50 yards west of where the male had thrown the bundle into the brush. It was Officer Hershey's intention to investigate these three males' suspicious activities further. He patted down each of the males for weapons and found none. He then advised each of the males of his *Miranda* warnings. Each said he understood those rights. It was Officer Hershey's opinion that the 3 males were not under arrest at that time.

6. By this time, the males who had been carrying the duffel bag and the brown paper bag had placed those packages on the ground. The brown paper bag sat opened, and in plain view Officer Hershey observed two telephones and two cartons of Kool cigarettes.

7. The male who had been carrying the duffel bag was identified as defendant Darron Barber. Defendant stated he did not wish to answer any of Officer Hershey's questions, and made movements as if he was going to leave the scene. Concerned as to his ability to investigate the situation further if any or all of the three males fled, Officer Hershey then handcuffed defendant to keep him at the scene. Given that defendant stated he did not wish to talk to Officer Hershey, Officer Hershey asked him no further questions.

8. The male who had been carrying the brown paper bag identified himself as Junior Aron Walker, although his true name was subsequently determined to be Chris Barber, the brother of defendant. Chris Barber agreed to talk to Officer Hershey and told him that he and his "friend" Darron had met Kim Anderson, the third male, at the bus stop up the street. He further stated that Anderson had told them that he was moving, and asked them to help him carry his property.

9. Officer Hershey then spoke separately with the third male who had thrown the bundle into the brush, identified as Kim Anderson. Anderson told Officer Hershey a different version of recent events. He stated that he had met up with the other two males at the bus stop and that they had told him that *they* were moving and that *they* had asked him to help *them* carry their load. When asked why he threw the bundle into the brush, Anderson told Officer Hershey that he did not know what Officer Hershey was talking about.

10. To make sure none of the three males took off with either of the two packages still in front of Officer Hershey, Officer Hershey placed the open paper bag and duffel bag on

top of his patrol car's hood. He patted down the duffel bag for weapons when he moved it, and felt what he immediately recognized to be, from his experience, electronic equipment.

11. At this point, approximately three minutes after Officer Hershey had first contacted the three males, other police officers began arriving in response to an earlier summons by Officer Hershey. Among those arriving was Officer T. Simonton. At Officer Hershey's request, Officer Simonton immediately checked the area where Anderson had thrown the bundle into the brush and found a videocassette recorder wrapped in an afghan blanket.

12. Another officer who had arrived, Lt. Vestal, informed Officer Hershey that approximately one-half hour earlier he had seen the defendant and the individual later identified as Chris Barber at the bus stop on the north side of Northeast Eighth Street just west of the west entrance to the Foothills Apartments (13700 block of Northeast Eighth Street). With that information, Officer Simonton then immediately drove to that bus stop, approximately four blocks away, and put his tracking dog to work in that area.

13. The dog immediately responded to a strong scent in the brush, and began tracking northbound to the south parking area of Foothills Apartments. The dog continued to the southwest corner of the apartments contained in Building C-4, and showed some interest in the corner apartment's west balcony. The dog then continued northbound past the balcony and responded to very strong scents in some bushes between the corner balcony and the next balcony to the north, of Apartment #103. The dog then directed Officer Simonton to a wall of the building directly below a sliding glass window. Officer Simonton then noticed the screen for that window was lying in the bushes.

14. As he was removing the dog from the bushes, Officer Simonton was contacted by the resident of an apartment in the building, one Dean Bakken. Bakken advised Officer Simonton that his apartment had recently been broken into, and that items were missing. He further told the officer that among the items missing were his Hitachi VCR, telephones, other electronic equipment, and a multi-colored afghan.

15. Officer Simonton then radioed the information relating to the burglary and the items stolen to Officer Hershey. The officers at the scene confirmed that the VCR which had been found in the brush was manufactured by Hitachi. At that point, Officer Hershey and the other officers at the scene detaining the defendant and the other two males believed they had probable cause to arrest the three males for possession of stolen property. Accordingly, the three males were then arrested. No more than ten to fifteen minutes had passed

between the time of the initial stop by Officer Hershey and the time of the three males' arrests.

16. Incident to the arrests at the scene, Officer Hershey and the other officers searched the three males and opened the duffel bag which had been carried by defendant. All of the items which had been reported stolen by Bakken were found either on the three males, in the open paper bag, or in the opened duffel bag. If the duffel bag had not been opened at the scene, its entire contents would have become visible to the officers once they had arrived at the police station and inventoried the bag's contents, given Bellevue police's inventory procedures.

## II.
## THE DISPUTED FACTS

1. Whether Officer Hershey's initial stop of defendant and his companions was based on a well-founded suspicion of criminal activity based upon specific and articulable facts?

2. Whether Officer Hershey's subsequent detention of defendant and his companions was reasonably related in scope to the circumstances which justified the interference in the first place? In particular, (a) whether the purpose of the stop was related to defendant's subsequent detention; (b) whether the amount of intrusion upon defendant in the course of the detention was reasonable; and (c) whether the length of defendant's detention was reasonable?

3. Whether the opening up of, and viewing the contents of, the duffel bag was lawful?

## III.
## FINDINGS OF FACT AS TO THE DISPUTED FACTS

1. Officer Hershey's initial stop of defendant and his companions was based on a well-founded suspicion of criminal activity based upon specific and articulable facts.

2. Officer Hershey's subsequent detention of defendant and his companions was reasonably related in scope to the circumstances which justified the interference in the first place. In particular, (a) the purpose of the stop was related to defendant's subsequent detention; (b) the amount of intrusion upon defendant in the course of the detention was reasonable; and (c) the length of defendant's detention was reasonable.

3. The opening up of, and viewing the contents of, the duffel bag was lawful. When he originally patted down the duffel bag for weapons, Officer Hershey inadvertently discovered that the bag contained electronic equipment. After reviewing the radio report from Officer Simonton as to the items which had been taken in the burglary of the Bakken residence, Officer Hershey and the other officers had every reason to believe the duffel bag contained contraband from the burglary, and specifically, the other stolen electronic equipment. The officers also had the right to search the duffel bag incident to defendant's

arrest. Finally, the duffel bag's contents would have been inevitably discovered at the police station in the course of an inventory of the duffel bag's contents.

IV.

## CONCLUSIONS OF LAW

1. Officer Hershey's initial stop of defendant and his companions, as well as his subsequent detention of defendant and his companions, were lawful actions. Further, the officers' opening up, and viewing the contents of, the duffel bag was also lawful. At the point Officer Simonton radioed the information relating to the burglary and items stolen to Officer Hershey, the officers had probable cause to arrest the 3 males for possession of stolen property.

2. Accordingly, defendant's motion to suppress evidence in this matter based on Officer Hershey's allegedly unlawful initial stop or subsequent detention of defendant is hereby denied. Defendant's motion to suppress the evidence found in the duffel bag is also hereby denied.

Following the trial court's ruling adverse to the defendant on his motion to suppress evidence, the facts — including police reports — were stipulated to by the defendant and the case was submitted to the trial court for decision based on those facts. These facts included the following: at the time the defendant was stopped, he was carrying loot taken in a very recent Bellevue residential burglary; police fingerprint experts lifted defendant's palm print from inside the burglarized premises; and, in addition, the defendant had other property in his possession which proved to have been stolen elsewhere. Based on the stipulated facts and evidence, the trial court found the defendant guilty of the crimes of burglary in the second degree and possession of stolen property in the second degree, then entered judgment and sentence accordingly.

Following his conviction in the trial court, defendant appealed to the Court of Appeals. That court, in a very short unpublished opinion, reversed defendant's convictions on the basis that the initial stop by the police officer was unlawful; that court did not, however, discuss the racial incongruity issue.[3] The Prosecuting Attorney for King County thereupon petitioned this court for discretionary

---

[3] *State v. Barber*, 54 Wn. App. 1045 (1989).

review; we granted the petition. We also permitted the American Civil Liberties Union to file an amicus brief on the racial incongruity issue.

Two issues are here determinative.

## ISSUES

ISSUE ONE. Are the trial court's suppression hearing findings of fact sufficient to permit us to properly review the trial court's decision as to the legality of the police officer's investigative or "*Terry*-type" stop of the defendant?

ISSUE TWO. May racial incongruity, *i.e.*, a person of any race being allegedly "out of place" in a particular geographic area, ever support a finding of reasonable suspicion of criminal behavior?

## DECISION

ISSUE ONE.

CONCLUSION. The findings of fact entered following the suppression hearing in the trial court did not sufficiently comply with the requirements of CrR 3.6 to permit a meaningful appellate review of the critical aspects of the trial court's decision on the *Terry*-type stop issue; therefore, the case must be remanded to the trial court for more specific findings as to the reasons that may justify the initial stop of the defendant and his companions.

The problems we are presented with in this case come about in the following way.

█ The case involves the often difficult question of when a police officer, absent probable cause to arrest, is legally justified in stopping and questioning a citizen. The leading case in this area of the law is, of course, *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968) wherein the United States Supreme Court stated the permissible grounds for an officer to make an investigative or "*Terry*-type" stop as follows:

> in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably

> warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

(Footnotes omitted.) *Terry*, 392 U.S. at 21-22. Any number of cases, our own as well as federal, have followed and elaborated upon this rule; it remains, however, the touchstone of the law in police investigative stop situations.

Where an unlawful stop is alleged, and evidence of crime is discovered as a result of the stop, as in this case, the issue is usually brought before the court by a defense motion to suppress the evidence so obtained. As a guide to the trial court in carrying out its duty of "neutral scrutiny" in assessing *Terry* stops, we have prescribed the trial court's duty at a suppression hearing by the following court rule:

> At the conclusion of a hearing, upon a motion to suppress physical, oral or identification evidence the trial court shall set forth in writing: (1) the undisputed facts; (2) the disputed facts; (3) the court's findings as to the disputed facts; and (4) the court's reason for the admissibility or inadmissibility of the evidence sought to be suppressed.

CrR 3.6.

■ The difficulty here is that on the central "legality of the initial stop" issue, the trial court's findings do not tell us precisely what "specific and articulable facts . . . , taken together with rational inferences from those facts, reasonably warrant that intrusion."[4]

In reviewing the CrR 3.6 findings and conclusions quoted above on the legality of the initial stop issue, we find this issue dealt with in the trial court's statement of the following *disputed fact*:

---

[4]*Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

> Whether Officer Hershey's initial stop of defendant and his companions was based on a well-founded suspicion of criminal activity based upon specific and articulable facts?

Finding of fact II(1). Then in the trial court's *findings of fact as to disputed facts*, the following is the very conclusory finding on this issue:

> Officer Hershey's initial stop of defendant and his companions was based on a well-founded suspicion of criminal activity *based upon specific and articulable facts.*

(Italics ours.) Finding of fact III(1). We are left guessing, however, as to what those facts are. Finally, the trial court's *conclusion of law* on the legality of the stop is the following:

> Officer Hershey's initial stop of defendant and his companions, as well as his subsequent detention of defendant and his companions, were lawful actions.

Conclusion of law IV(1) (part).

Thus, as noted at the outset of this discussion, the crucial finding of the trial court on this issue is entirely conclusory and fails to inform us what "specific and articulable facts" the trial court felt justified the investigative or *"Terry-*type" stop of the defendant and his companions. A principal purpose of requiring such findings is to facilitate appellate review of the trial court's decision regarding the suppression motion.[5] The trial court's failure to set out in its findings what specific and articulable facts it relied on leaves the parties to argue widely divergent views of why the stop was made, as they did in the Court of Appeals and again in this court.

The Court of Appeals, having been left without guidance from the trial court on what "specific and articulable facts" warranted the stop, selected its own from the various facts and held them insufficient as a matter of law and reversed the defendant's convictions. On petitioning this court for review, the State argues with considerable justification that there were other facts amply justifying the stop. The State then urges that we consider additional facts in the record,

---

[5]*See* 12 Wash. Prac., *Criminal Practice* § 2409, at 468 n.2 (1984).

reach a decision contrary to that reached by the Court of Appeals on the legality of the stop issue and affirm the convictions.

The findings that were entered by the trial court basically constitute a narrative account of what occurred at the scene of the investigatory stop and the subsequent investigation and arrest, but nowhere point to what "specific and articulable facts" reasonably support a suspicion that criminal activity was afoot. The problem in this case is that the absence of such particularized findings does not permit us to determine whether the stop was based on legally permissible and adequate reasons or whether it was based on a perceived racial incongruity between the suspects and the locale in which they were stopped, as will be discussed under Issue Two herein.

As we recently held in *In re LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986), "where findings are required, they must be sufficiently specific to permit meaningful review." Since we have not been provided with the sufficiently specific findings needed to review the trial court's decision on the legality of the initial stop in this case, we reverse the Court of Appeals order dismissing the case and remand it to the trial court for entry of findings of fact in accordance with the mandates of *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), CrR 3.6 and this opinion.

ISSUE TWO.

CONCLUSION. We answer "no" to the question posed by this issue, and remand to the trial court for additional findings in regard to the facts supporting a *Terry* stop. These facts cannot include any consideration of "racial incongruity" as defined herein.

The defendant and his two companions, who were stopped by the police officer, were black and were walking in a predominantly white neighborhood at the time they were stopped.

The defendant and amicus argue that the reason the officer made the investigative stop of the defendant and his companions is that they were blacks in a predominantly

white neighborhood, and that the stop was thus illegal. There is testimony in the record that arguably supports this view.

There is also testimony in the record, however, that arguably supports a contrary view. This includes the following: (1) one of the three persons walking along the Bellevue street at approximately 8 p.m. was carrying a large blanket-covered bundle; (2) as the officer drove past them in his marked police patrol car, they noticed the officer and began glancing at him and at each other; (3) after the officer had passed the group, he continued observing them through his rearview mirror, and they continued to glance at him and at each other; (4) the officer then saw the one carrying the blanketed bundle heave the bundle into brush off the shoulder of the roadway; (5) the contents of the blanket appeared to the officer to be of substantial weight, since the bundle did not fall very far into the brush despite what appeared to have been a fair amount of exertion by the person throwing the bundle; (6) the acts of the person throwing the bundle constituted at least littering; (7) to this police officer (of some 10 years' experience), when a person is carrying a bundle within a blanket on a street at night, the items covered are usually the fruits of a recent burglary and (8) according to uncontroverted testimony at the suppression hearing, when seen by the officer, the defendant was walking out in the street in violation of law.[6] In short, the testimony given at the suppression hearing is conflicting on a critical factual issue.

■ It is the law that racial incongruity, *i.e.*, a person of any race being allegedly "out of place" in a particular geographic area, should never constitute a finding of reasonable suspicion of criminal behavior.[7] Distinctions between citizens solely because of their ancestry are odious to a free

---

[6]*See* former RCW 46.61.240 (Laws of 1965, 1st Ex. Sess., ch. 155, § 35); former RCW 46.61.250 (Laws of 1965, 1st Ex. Sess., ch. 155, § 37).

[7]*See People v. Bower*, 24 Cal. 3d 638, 644, 597 P.2d 115, 156 Cal. Rptr. 856 (1979); *State v. Hobart*, 94 Wn.2d 437, 446, 617 P.2d 429 (1980).

people whose institutions are founded upon the doctrine of equality.[8]

Of assistance in putting the factual situation of this case into context is the decision of the Ninth Circuit Court of Appeals in the frequently cited case[9] of *United States v. Bautista*, 684 F.2d 1286 (9th Cir. 1982), *cert. denied*, 459 U.S. 1211, 75 L. Ed. 2d 447, 103 S. Ct. 1206 (1983). In that case, Circuit Judge Jerome Farris (formerly of the State of Washington Court of Appeals) writing for the Ninth Circuit declared the law as follows:

> A. INITIAL STOP
> Defendants contend the stop was based on nothing more than the defendants' racial appearance, and that therefore the police did not have the founded suspicion of criminal conduct necessary under the Fourth Amendment to justify the stop. *See Terry v. Ohio*, 392 U.S. 1, 19-22, 30, 88 S.Ct. 1868, 1878-80, 1884, 20 L.Ed.2d 889 (1968).
> Race or color alone is not a sufficient basis for making an investigatory stop. *United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87, 95 S.Ct. 2574, 2582-83, 45 L.Ed.2d 607 (1975); *United States v. Mallides*, 473 F.2d 859, 862 (9th Cir. 1973) (citing *Davis v. Mississippi*, 394 U.S. 721, 726-27, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969)). However, race can be a relevant factor. *Brignoni-Ponce*, 422 U.S. at 886-87, 95 S.Ct. at 2582-83.

(Footnote omitted.) *Bautista*, 684 F.2d at 1288-89. The *Bautista* court then went on to explain and apply this rule:

> For example, a founded suspicion to make a border patrol stop can be based in part upon "the characteristic appearance of aliens." *United States v. Harrington*, 636 F.2d 1182, 1185 (9th Cir. 1980). Here, the police did not stop the defendants solely because their racial appearance matched the racial description of the robbery suspects. The police also noted the defendants' presence on a likely escape route one-half mile from the bank and a few blocks from the suspected getaway car, only 15 minutes after the robbery. The defendants were the only people in sight who matched the description of the robbers. The

---

[8]*Loving v. Virginia*, 388 U.S. 1, 11-12, 18 L. Ed. 2d 1010, 87 S. Ct. 1817 (1967).

[9]*See Harbin v. Alexandria*, 712 F. Supp. 67, 71 n.5 (E.D. Va. 1989); *United States v. Fouche*, 776 F.2d 1398, 1401, 80 A.L.R. Fed. 605 (9th Cir. 1985); *United States v. Magana*, 797 F.2d 777, 781 (9th Cir. 1986).

> policemen observed that the defendants' dress was inappropriate for the weather, and that their relatively dry appearance, despite the rain, was consistent with having just left a car. These facts and circumstances justified the police officers' decision to make an investigatory stop. Treating racial appearance as one factor contributing to the founded suspicion of criminal conduct was not inappropriate.

*Bautista*, 684 F.2d at 1289. Thus, *Bautista* indicates that appearance, including race and other physical attributes of a suspect, may be relevant in forming a suspicion of criminal activity; racial incongruity, however, is never relevant in forming such a suspicion.

In reading the trial court's findings and conclusions entered following the suppression hearing in this case, it is at once apparent that the trial court's *only* reference to race was its observation that both the defendants *and* the Bellevue police officer who arrested them were black. That statement alone, however, does not indicate that the trial judge found that racial incongruity was a factor which supported the *Terry* stop. So that the basis for the trial court's decision in this case may be clarified, the Court of Appeals should be reversed and the case remanded to the trial court to make additional findings of fact as to the following: eliminating any consideration of racial incongruity whatsoever, were there facts to support a legally justified and well-founded suspicion of criminal activity at the time the arresting officer stopped the defendant and his companions? If such facts do exist, the trial court is required to specify them. In requesting such specification, we are not abdicating our responsibility (as the dissenting opinion suggests); we are remanding this case (as is *our* function) so that the trial court, as the trier of fact (as is *its* function) may make the factual determinations necessary to assess the legal validity of the investigative stop.

Further response to the dissent is necessary. First, the dissent declares that the *Terry* stop in this case was based on a police officer's assumption that "three black men walking in Bellevue must be up to no good" and therefore was unlawful.[10] The dissent overlooks the fact that, in examin-

---

[10]Dissenting opinion, at 350-51.

ing the legal validity of a *Terry* stop, the police officer's assumptions are irrelevant and not to be taken into account by the trial court in its redetermination. As our opinion makes clear, it is well-established law, federal and state, that the facts surrounding an investigative stop must be judged against an *objective* standard: would the *facts* available to the officer at the moment of the seizure or the search "warrant a [person] of reasonable caution in the belief" that the action taken was appropriate?[11]

Under the terms of our remand, the trial court is required to reexamine the facts surrounding the investigative stop in this case against this *objective* standard. If the facts that the trial court relies upon include any reference to racial incongruity, the *Terry* stop was unlawful. If, however, the trial court cites objective facts that support a *legally justified* and well-founded suspicion of criminal activity — *i.e.*, one based on facts that make no reference to racial incongruity — then the *Terry* stop was valid and the motion to suppress was properly denied.

The Court of Appeals is reversed and the case is remanded to the trial court with instructions.

BRACHTENBACH, DURHAM, and GUY, JJ., and CALLOW, J. Pro Tem., concur.

DORE, C.J., concurs in the result.

DOLLIVER, J. (dissenting) — It has been a long and difficult period of gestation for this case; in the interval, the defendant has been freed from prison. But, the significance of the issue now before us remains.

The majority makes the forthright declaration that "racial incongruity . . . should never constitute a finding of reasonable suspicion" justifying an investigative stop. Majority, at 346. While I agree with and applaud this statement, as far as it goes, I nonetheless cannot sign the majority opinion and therefore dissent.

---

[11]Majority opinion, at 342-43 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)).

At the outset, contrary to the majority, I see no confusion in the record and no need for remand. The source of the confusion lies not with the facts but with the trial court's and now the majority's mischaracterization of issues of law as disputed facts. Majority, at 340, 343-44. CrR 3.6 creates a duty for the trial court to set forth the disputed facts and its findings of fact, but in this case the facts were undisputed. As a consequence, the trial court, apparently, incorrectly labeled the issues of law as disputed facts. We should not continue this error. Further, CrR 3.6 does not create a duty that requires a trial judge to set forth " 'specific and articulable facts' " it "felt justified the investigative or '*Terry*-type' stop". Majority, at 344. That duty is on the police officer. *Terry v. Ohio*, 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The duty of the trial court and this court is to determine whether a stop was justified based on the evidence. *See State v. Mennegar*, 114 Wn.2d 304, 309-10, 787 P.2d 1347 (1990). A remand is unwarranted.

The evidence shows that, but for the race of the defendants, Officer Hershey would not have slowed down to look at them twice. As he testified, when he saw them he "became suspicious. It was unusual to see three black guys carrying items, walking, at least in that part of the city." Report of Proceedings, at 6 (Jan. 19, 1988). When asked to explain his statement — given a chance to deny that his suspicion was merely a racially motivated hunch — Officer Hershey stated that, based on his experience, "the whole circumstance" (which at that point consisted of three black men walking together on a street in Bellevue on an evening in late spring, one carrying a gym bag, one a brown paper bag, and one an item wrapped in a blanket) "[n]ormally" meant "a crime had just been committed . . .". Report of Proceedings, at 6 (Jan. 19, 1988).

This type of assumption by a police officer is simply unacceptable. The fact that Officer Hershey is black does not make it more acceptable, nor does the fact that, in this case, Officer Hershey's hunch turned out to be correct. Every-

thing that happened and everything Officer Hershey saw after he initially decided three black men walking in Bellevue must be up to no good is tainted by that decision, and this court should say so.

The majority's holding would allow *Terry* stops if there are sufficient "facts to support a legally justified and well-founded suspicion of criminal activity at the time" of the stop, regardless of whether the initiating factor in the sequence of events leading up to the stop was solely based upon racial incongruity. Majority, at 348. I strongly disagree with this test.

The court has consistently applied the exclusionary rule where it has deemed it necessary to deter police misconduct and preserve the dignity of the judiciary. *See State v. Bonds*, 98 Wn.2d 1, 12, 653 P.2d 1024 (1982), *cert. denied*, 464 U.S. 831 (1983). The same mandates should be applied here.

Racial incongruity overhangs this entire case like a noxious pall, and it will not be eliminated by the test set forth by the majority anymore than all the perfumes of Arabia would sweeten the little hand of Lady Macbeth.

Some might argue that adopting my view would merely encourage police officers not to tell the truth, unlike Officer Hershey who, to his great credit, did. Human nature being what it is, this gloomy view may have some force. There is, however, another more important characteristic of human nature which must be considered. If appropriate conduct is practiced, even hypocritically at first, the conduct will eventually become the belief. Put another way, the mask will become the face. The most celebrated literary example of this truth is the short story by Max Beerbohm entitled "The Happy Hypocrite" (see M. Beerbohm, *The Incomparable Max* 364 (1962)). And, as all sentient persons know, it happens as well in real life. However unhappily, the mask of civilized conduct may be put on and worn. For most who don it, the truth will ultimately shine through. Changed attitudes on the matter of racial equality and civil rights since 1954 bear testimony to this.

I would hold that if racial incongruity, alone, initiates the sequence of events leading to an investigative stop — as I am convinced it does here — then the conviction must be overturned. I think this court should do no less.

UTTER and SMITH, JJ., concur with DOLLIVER, J.