**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81048-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| AARON MAURICE MYLAN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

MANN, C.J. — Aaron Mylan appeals his convictions for possession of heroin with intent to manufacture or deliver, possession of methamphetamine, third degree driving while license suspended (DWLS), all within 1,000 feet of a designated school bus stop. Mylan argues that the trial court erred in failing to suppress evidence obtained during his initial warrantless search, that the prosecutor committed misconduct, and that the evidence was insufficient to support that the offense occurred within 1,000 feet of a designated school bus stop. We agree that the trial court erred in failing to suppress evidence obtained during the warrantless search of Mylan, as well as evidence obtained as a result of the initial search. We reverse and vacate Mylan's conviction.

Citations and pin cites are based on the Westlaw online version of the cited material.

I.

In February 2017, Jefferson County Sheriff Deputy, Sergeant Andrew Pernsteiner contacted Mylan under suspicion he was driving with a suspended license. Pernsteiner did not arrest or cite Mylan. On June 6, 2017, Pernsteiner received a bulletin from the Department of Corrections concerning Mylan. The bulletin included a picture of Mylan and stated:

> Alert: Danger to Law Enforcement; Violent Offender; Documented Norteno Affiliate; Known to carry and use firearms and knives.
>
> . . . .
>
> This offender has a major chip on his shoulder as he has a well-developed dislike of law enforcement, has spent most of his life in prison, and is associated with a gang and the gang lifestyle.
>
> Mylan is a drug dealer who is known to have/carry firearms and/or knives. He is known to flee and resist arrest. He is also a prolific property offender. It is not just likely but highly probable that you will be having contact with this offender soon. I am requesting that ANY and ALL contact be reported to me immediately and that I be called to the scene to assist with this offender as he has 934 days of prison time (as of this date) to take if/when he commits a significant violation.
>
> Please be mindful of this offender and be careful out there!

Shortly after seeing the bulletin, Pernsteiner checked Mylan's driving status and confirmed that his license was still suspended.

Pernsteiner was aware that Mylan lived in a trailer park with his uncle. Pernsteiner was also aware that Mylan dated an individual that owned a Volvo and he had seen the Volvo parked outside of Mylan's resident on prior occasions. On June 15, 2017, Pernsteiner was on patrol and driving past the trailer park when he saw the Volvo preparing to exit the trailer park. Pernsteiner recognized Mylan in the driver's seat and saw a passenger in the car.

Pernsteiner pulled over, rolled down his window, and asked Mylan why he was driving without a license. Pernsteiner did not activate his emergency lights, check Mylan's driving status, or ask Mylan for his license and registration. Pernsteiner testified he believed "it's quicker to take action than it is to pull over and wait five minutes for a return."

Mylan responded, "I know my girl is sick and I just need to run to the store to get her cough syrup." Pernsteiner testified that he considered this statement an admission of guilt as he had seen Mylan pull forward in the car. Pernsteiner got out of his car, walked over, and asked Mylan to step out. As Mylan stepped out of the vehicle, it started to roll and Mylan lurched back toward it. Pernsteiner assumed Mylan was attempting to stop it. Pernsteiner grabbed Mylan's wrists, preventing him from entering the car, as the passenger pulled the emergency brake and stopped the vehicle. Pernsteiner testified that Mylan tried to pull away from his grasp and reached for his front pocket. Pernsteiner then wrapped his arms under Mylan and walked him over to his patrol car. Pernsteiner told Mylan to calm down, and that if he cooperated he would only get a citation for driving with a suspended license, but if he fought him, he would be going to jail. Pernsteiner was then able to handcuff Mylan without further resistance.

Pernsteiner then reached in and emptied Mylan's right front pocket and pulled out a bag containing just under one ounce of heroin. Pernsteiner did not pat down Mylan, but emptied his pockets because "he's known to associate with people that use hypodermic syringes . . . and doing a pat-down of someone that uses hypodermic needles can get you poked with a needle." Pernsteiner testified that he wanted to

confirm that Mylan did not have any weapons in his pants pocket, since he had reached for it prior to being handcuffed. Pernsteiner's basis for reaching into Mylan's pocket was concern for his safety—as he had read the police bulletin, Mylan had been resistant, Pernsteiner was alone, and it was after midnight. Pernsteiner explained that it was routine procedure for him to search someone before putting them in his car, even if they were not under arrest.

After emptying Mylan's pockets, Pernsteiner placed Mylan under arrest for possession of heroin and read him his Miranda[1] rights. Mylan told Pernsteiner that someone named "Mike" gave him the drugs, and he pleaded with Pernsteiner to lose the drugs. Deputy Adam Newman, a backup officer, arrived on the scene and told Pernsteiner that he saw something on the driver's floorboard. Pernsteiner observed a large manila envelope, and obtained a search warrant for the car, requesting to seize heroin, contraband, or fruits of the crime. The envelope contained three ounces of heroin, packaged in three, one-ounce bags. Pernsteiner also collected a soda cap with residue that tested positive for methamphetamine.

Mylan was charged with possession of heroin with intent to manufacture or deliver within 1,000 feet of a school bus stop, possession of methamphetamine, and third degree DWLS.

Mylan moved to suppress all evidence resulting from the warrantless search of his person pursuant to CrR 3.6. The trial court denied the motion to suppress. The court found that Mylan was not under arrest when he was handcuffed but was detained for further investigation of driving without a license. The court further found that:

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

> Sergeant Pernsteiner detained Mr. Mylan in handcuffs because of the details outlined in the officer safety bulletin, namely flight risk, that he was known to carry weapons; his actions that night in trying to get away from the Sergeant; that Mr. Mylan was trying to go toward his pocket; that the Sergeant was there by himself; that it was during hours of darkness; and that there was still someone in the car that was unidentified.

The court declined to suppress the evidence, concluding that the detention, search, and subsequent arrest of Mylan were lawful. A jury found Mylan guilty on all charges. Mylan appeals.

II.

Mylan argues that the trial court committed reversible error when it denied his motion to suppress evidence because the search of his pocket was an improper, warrantless search. Mylan argues that evidence of the heroin should be suppressed and that his subsequent statements and the evidence found in the car that were derived from the unlawful search should be suppressed as fruit of the poisonous tree.

We review the trial court's conclusions of law in an order relating to suppression of evidence de novo. State v. Smith, 165 Wn.2d 511, 516, 199 P.3d 386 (2009). We review the findings of fact for substantial evidence. State v. Winterstein, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009).

The protections guaranteed by article I, section 7 of the Washington Constitution are greater than those provided by the Fourth Amendment to the United States Constitution. State v. Eisfeldt, 163 Wn.2d 628, 634, 185 P.3d 580 (2008). Article I, section 7 provides that "no person shall be disturbed in his private affairs, or his home invaded, without authority of law." In Washington, warrantless searches and seizures are per se unreasonable. State v. Hendrickson, 129 Wn.2d 61, 70, 917 P.2d 563 (1996). However, there are a few "jealously and carefully drawn" exceptions to the

5

warrant requirement which "provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." Hendrickson, 129 Wn.2d at 70 (citing Arkansas v. Sanders, 442 U.S. 753, 759, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979), abrogated by California v. Acevedo, 500 U.S. 565, 111 S. Ct. 1982, 1984, 114 L. Ed. 2d 619 (1991)).

The State bears the burden to demonstrate that a warrantless search fits within one of the closely guarded exceptions. Smith, 165 Wn.2d at 517. The exceptions to the requirement of a warrant fall into several broad categories including: consent, exigent circumstances, searches incident to a valid arrest, inventory searches, plain view, and Terry[2] investigative stops. Hendrickson, 129 Wn.2d at 71.

A.

One such exception to the warrant requirement is a search incident to arrest. State v. O'Neill, 148 Wn.2d 564, 583, 62 P.3d 489 (2003). A lawful custodial arrest is a constitutionally required prerequisite to any search incident to arrest exception to the warrant requirement. O'Neill, 148 Wn.2d at 585. "The search incident to arrest exception functions to secure officer safety and preserve evidence of the crime for which the suspect is arrested, in the absence of a lawful custodial arrest a full blown search, regardless of the exigencies, may not validly be made." O'Neill, 148 Wn.2d at 585. Probable cause for a custodial arrest is not sufficient authority for a warrantless search, rather, there must be an actual custodial arrest to provide the authority for a warrantless search incident to arrest. O'Neill, 148 Wn.2d at 585.

---

[2] Terry v. Ohio, 392 U.S. 1, 10, 88 S. Ct. 1868, 1874, 20 L. Ed. 2d 889 (1968).

Mylan argues that when Pernsteiner emptied Mylan's pockets, it was not a valid search incident to arrest because he had not been arrested yet. Although the State contends that Pernsteiner had probable cause to arrest Mylan, this argument does not cure the warrantless search. A valid search incident to arrest exception requires an actual custodial arrest to justify a search without a warrant. Here, the trial court specifically found that Mylan was not under arrest when the search occurred. Mylan did not believe he was under arrest at the time of the search, as Pernsteiner had instructed him he would be let off with a citation if he cooperated. Mylan then cooperated, and Pernsteiner was able to handcuff him. Because Pernsteiner searched Mylan before arresting him, the fact that he had probable cause to arrest Mylan is irrelevant. In order to have a valid exception to the warrant requirement, Mylan would need to be searched incident to arrest. Because Mylan was searched before he was arrested, the exception does not apply.

B.

In Terry v. Ohio, 392 U.S. 1, 10, 88 S. Ct. 1868, 1874, 20 L. Ed. 2d 889 (1968), the United States Supreme Court carved another exception to the warrant requirement by allowing officers to briefly detain an individual as part of an investigatory stop. Under the Terry stop exception, a police officer may briefly stop and detain an individual for investigation if the officer reasonably suspects the person is engaged or about to be engaged in criminal conduct. State v. Garvin, 166 Wn.2d 242, 250, 207 P.3d 1266 (2009). The officer may only frisk the individual for weapons when the officer has grounds to believe the individual is armed and presently dangerous. Terry, 392 U.S. at 29. "For a permissible Terry stop, the State must show that (1) the initial stop is

7

legitimate; (2) a reasonable safety concern exists to justify the protective frisk for weapons; and (3) the scope of the frisk is limited to the protective purposes." State v. Duncan, 146 Wn.2d 166, 172, 43 P.3d 513 (2002).

A search pursuant to a Terry stop must be justified not only in its inception, but also in its scope. State v. Hudson, 124 Wn.2d 107, 112, 874 P.2d 160 (1994). "A valid weapons frisk is strictly limited in its scope to a search of the outer clothing; a patdown to discover weapons which might be used to assault the officer." Hudson, 124 Wn.2d at 112. The instances in which an officer may exceed the search beyond a pat down of the outer clothing are generally limited to cases where the pat down is "inconclusive." Hudson, 124 Wn.2d at 112. "If the officer feels an item of questionable identity that has the size and density such that it might or might not be a weapon, the officer may only take such action as is necessary to examine such object." Hudson, 124 Wn.2d at 113 (citing Terry 392 U.S. at 30). As the Hudson court further explained by way of example:

> Illustrative is [State v. Hobart, 94 Wn.2d 437, 440, 617 P.2d 429 (1980)], where a policy officer felt spongy objects in the suspect's pockets during a weapons patdown. Although the officer had no fear that the objects were weapons, the officer squeezed them and determined that they were balloons containing narcotics. The court held that once the officer had ascertained that the objects were not weapons, the permissible scope of the search had ended and any further search required probable cause. The court warned that "[t]o approve the use of evidence of some offense unrelated to weapons would be to invite the use of weapons' searches as a pretext for unwarranted searches."

Hudson, 124 Wn.2d at 113. See also Garvin, 166 Wn.2d at 249 (officer's act of squeezing defendant's coin purse after determining there was no weapon in the coin purse exceeded lawful Terry stop).

Here, even if the search met the first prong under Terry and Pernsteiner believed Mylan might be armed and dangerous, his action of reaching into Mylan's pocket and

removing the contents exceeded the lawful scope of a Terry search. When questioned why he did not conduct a pat down first, Pernsteiner explained only that he believed Mylan associated with individuals that use needles and he did not want to injure himself by conducting a pat down. Pernsteiner could not explain why reaching directly into a pocket to empty it would be more protective than a pat down. It defies common sense.

Because reaching into Mylan's pocket exceeded the scope of Terry, the search does not fall within the Terry exception. As Pernsteiner's search of Mylan was conducted without a warrant and without a valid exception to the warrant requirement, the trial court erred when it denied Mylan's motion to suppress.

C.

Mylan also argues that the trial court erred in denying the motion to suppress because the evidence seized from the car and his statements after the arrest must be suppressed as fruit of the poisonous tree. We agree.

Evidence seized during an illegal search is suppressed under the exclusionary rule. State v. Gaines, 154 Wn.2d 711, 716, 116 P.3d 993 (2005). Evidence that is derived from the illegal search may also be suppressed under the fruit of the poisonous tree doctrine. Gaines, 154 Wn.2d at 717. Under the independent source doctrine, evidence tainted by an unlawful search is not subject to suppression under the exclusionary rule, provided that it was obtained pursuant to a valid warrant. Gaines, 154 Wn.2d at 718. However, the warrant must contain "facts independent of the illegally obtained information sufficient to give rise to probable cause." Gaines, 154 Wn.2d at 718. When a defendant's confession is obtained as the direct result of an

9

unlawful search, the evidence is inadmissible as fruit of the poisonous tree. State v. Fricks, 91 Wn.2d 391, 398, 588 P.2d 1328 (1979).

Mylan correctly argues that the evidence seized from the car and his statements after the arrest should be excluded under the fruit of the poisonous tree doctrine. The search warrant of the vehicle was based entirely from the heroin recovered during the warrantless search of Mylan's pocket. Without the unlawful search, there would not have been probable cause to search the vehicle. Mylan's statements after the arrest also were directly related to the heroin that Pernsteiner recovered from his pocket. Because the evidence in the car and Mylan's statements after the arrest are fruits of the poisonous tree, the trial court erred when it denied Mylan's motion to suppress.[3]

We reverse and vacate Mylan's convictions.

_Mann, C.J._

WE CONCUR:

_Chun, J._          _Leach, J._

---

[3] In his appeal, Mylan also alleged that there was prosecutorial misconduct, that there was insufficient evidence to support the sentencing enhancement, and that the trial court erred in imposing a $200 filing fee. Because we are reversing on the basis that the trial court improperly denied Mylan's CrR 3.6 motion to suppress evidence, we will not address these arguments.